RUDOLPH F. KLATT, Appellee, v. CHET B. AKERS, Auditor
of State, Appellant.

No. 45613.

SEPTEMBER 29, 1942.

REHEARING DENIED MARCH 12, 1943.

John M. Rankin, Attorney General, and Floyd Philbrick, First Assistant Attorney General, for appellant.

Sullivan & Scholz, of New Hampton, and J. R. McManus and M. H. Johnson, both of Des Moines, for appellee.

BLISS, J.—This case and that of Warner v. Akers, 232 Iowa 1348, 5 N. W. 2d 603, and the case of Neargard v. Akers, 232 Iowa 1337, 5 N. W. 2d 613, were tried in the court below to the same judge, on successive days, and the testimony of some of the witnesses in the Warner case was, by consent of court and counsel, considered by the court, without repetition, in the other two cases. While the pleadings, evidence, issues, and judgment in the trial court, and the assignments of error urged in this court, are substantially the same in each case, there are some variances which we wish to point out.

The plaintiff herein began work in the office of the state auditor who preceded the defendant, as an assistant or junior examiner, about August 15, 1933. He continued in that capacity until January 1934, when he was promoted to a state examiner, or senior examiner, such as is referred to in section 114, Codes, 1931, 1935, 1939, and was continuously so employed until January 26, 1939, when he was discharged in the manner complained of in his petition, by the defendant. Junior or assistant examiners, appointed under section 115 of said Codes, are paid four, five, or six dollars for each day they work, with the per diem in each case dependent upon the aptitude and efficiency of the employee. When the plaintiff was employed he was told that the length of the term of his appointment as junior examiner would depend upon his showing of capability, and the time of his appointment as senior examiner and the length of that work would depend upon his ability. The plaintiff and each other senior examiner received seven dollars for each day of work. Plaintiff lost but a few days during his term of service. There is no question about his being a veteran. No charges were filed against him, nor was any hearing had, it being the expressed view of the defendant that the confidential nature of the position made such proceedings unnecessary.

The plaintiff was not employed as an examiner after Janu-

ary 26, 1939, the day that he reported the completion of his audit in Dallas county. The parties stipulated, subject to the plaintiff's objection of immateriality, irrelevancy, and incompetency, which objection was overruled, that E. C. Hollowell, who was employed as a senior examiner on February 1, 1939, was an honorably discharged veteran of the World War between the United States of America and the Imperial German Government, and that Loomis and Wiley, who were named as senior examiners a little later, were also World War veterans. Mr. Truax, who held a supervisory position under both the defendant and his predecessors, testified, without contradiction:

"We [referring to the defendant] put eight veterans on, if I remember correctly, and discharged five in the county audit division."

Plaintiff was employed in the county-audit division.

The plaintiff pleaded his case on the "emoluments of office" theory, but tried it on the theory that he should be charged with earnings received by him from other work engaged in during the period of his discharge. He testified that, though he tried diligently, he was able to earn but $55 during this period. The trial court, on July 1, 1940, found the plaintiff entitled to $7 a day for every working day from January 26, 1939, or $3,021 less $55, and rendered judgment for $2,966, and further adjudged that the defendant certify said amount to the comptroller of the state for payment, and that the defendant "do every act and thing as Auditor of the State of Iowa as may be necessary to cause said amount to be paid to plaintiff, together' with the additional pay of plaintiff at the rate of $7.00 per diem, Sundays and holidays excluded, which will have accrued as plaintiff's back pay after this date and until he shall have actually been reinstated and given employment as such senior examiner by defendant herein."

I. Appellant assigns error as follows:

"The position of junior [senior] examiner from which the plaintiff was discharged was a position of strictly confidential relationship and as such was not within the provisions of the Soldiers Preference law appearing as Chapter 60, Code 1939,

and the Court erred in holding that the position was not one of strictly confidential relationship and in holding that the plaintiff was within the provisions of said Chapter.''

The question is always troublesome. The powers and duties of the appellant, as auditor of state, are set forth in chapter 10 of the Code of Iowa. In addition to his requiring full settlement between the state and all state officers and departments, annually or oftener, he is required to examine annually the financial condition and transactions of counties, schools, and cities. He shall appoint such number of state examiners of accounts, of recognized skill and integrity, familiar with the accounting systems of these municipal subdivisions, and with the laws relating thereto. Each examiner shall give bond in the sum of $2,000, conditioned as bonds of county officers, approved and filed as bonds of state officers. These examiners at all times shall be subject to the direction of the auditor. He may appoint such assistants to the examiners as may be necessary, who shall be subject to discharge at any time, who shall receive such reasonable compensation as the auditor may fix. The examiners shall have the right while making examinations to see all papers, books, records, etc. and, in the presence of the official custodian thereof, or his deputy, to have access to the cash drawers and cash, and the right to examine the public accounts of the municipality in any depository. All examinations shall be made without notice, and shall include investigation as to the financial condition and resources, cost price of improvements and materials as compared to those in like municipalities, whether the laws are being complied with, and the accounts and reports are being accurately kept. All examiners shall have power to issue subpoenas, administer oaths, examine witnesses, in all matters pertaining to an authorized examination. He may apply to a district court or judge to aid him, if necessary, with a recalcitrant witness. A report of every examination shall be in triplicate, signed and verified by the officers making the examination, and one copy each filed with the auditor of state, the municipality, and if the examination discloses any irregularity in the collection or disbursement of public funds, a copy shall be filed with the county attorney. Section 123 of the Iowa Code provides:

"No such examiner shall make any disclosure of the result of any investigation, except as he is required by law to report the same or to testify in court. Any violation of this provision shall be ground for removal."

Each examiner is required to file with the state auditor and with the municipal subdivision examined an itemized sworn voucher of his per diem and expenses, during the time actually engaged in the examination, which amount is charged against the municipality.

With respect to an examiner such as the plaintiff, there was undisputed testimony that:

"In making his examinations it is his duty to verify the cash on hand in the county treasurer's office when he begins the examination to see if it agrees with the daily cash book, to examine all moneys disbursed and received by the County Treasurer or County Auditor, and all county officials in their official capacity, and to inspect claims that have been paid; it is his duty to inspect the claims that have been paid to see if the payments made in one county for articles that are purchased in other counties compare favorably in cost; to see if the reports and accounts of the officers are being properly kept, and if the money that they receive is properly turned over and accounted for and to see if the officials comply with the law. * * * It is the general practice, as I have observed, that if we find there is an official guilty of wrong-doing in his official account, we are called upon to verify some of his personal transactions, and are frequently required to make an examination of his personal bank account. As to the breadth and scope of investigations, there are times in connection with county affairs where it is necessary to investigate private individuals. I refer to cases where there is evidence of criminal liability, which is not an uncommon thing to find. Sometimes it is necessary to call in parties and inquire from them what relation they had with the officials and what transactions they have had and verify many of the transactions in matters of that kind in that way. The way we have conducted our office, the examiners are advised that whenever they find evidences of misconduct on the part of officials that

they confer with the State Auditor's office and advise them as to what they ran into and keep us fully apprised as to what their findings are and, if necessary, to ask counsel and advice in handling the matter and it is my knowledge and information that our examiners follow the method of that procedure in doing those things."

Mr. Foarde, the deputy auditor under appellant's predecessor, testified that there were many defalcations during his tenure of office.

A supervisor of county audits, who had been in the auditor's office for many years, in various capacities, and who was employed there from May 1937, to the time of the trial, testified, in substance: That it was the practice of the examiner or assistant examiner to confer with the supervisor, either in the office or in the field, in regard to certain phases of the work, as there are many occasions when an examiner may find something indicating a defalcation. On these occasions it is sometimes necessary for an examiner or a junior examiner to make investigations outside of the records and to inquire of individuals what they may know of the matters, and to secure affidavits respecting them. The details that are discovered in the full and complete investigation by the examiner or junior examiner are not always attached to the formal report made, particularly when they can be found in the examiner's working papers. In my experience, criminal proceedings have been commenced as a result of audits. If an examiner or assistant examiner reports matters indicating a defalcation or embezzlement, the supervisor will work with him and investigate pretty carefully before anything is allowed to creep out about it. The examiner and the assistant, together with the auditor's office, work in secrecy on these matters until they know just where they are at, and sometimes we think we have found a defalcation and when we get through the audit we find that we are mistaken, that things will iron out, and we usually approach them with a good deal of caution. We want to know for sure that we are on solid ground before we make any charges of shortage or defalcation. Sometimes we think there may be defalcation and it turns out that there has not been. If they are sure of a defalcation, the examiner and assist-

ant examiner, the supervisor, and county attorney usually confront the defaulter and the matter is threshed out in conference before any report is made. The examiners and assistant examiners have the duty of verifying and following up any leads that they have which would indicate any defalcation, and nail it down and find out and determine whether there has been any irregularity, or any funds have been misplaced or misappropriated, and the examiner and assistant examiner are under the duty of reporting to the supervisor of audits before the formal report is made as to what the purported situation is.

The question involved in this division of the opinion is whether the appellee, in the position or office from which he was discharged, was "holding a strictly confidential relation to the appointing officer," as provided in section 1165 of the Code of Iowa. If he was holding such place, then chapter 60 has no application. The court has passed upon the question a number of times in recent years. While the facts in no two cases are alike in all particulars, and therefore none of these cases are precise precedents, yet, insofar as they may state pertinent general principles, or the facts may present reasonable similarity to those in the case for determination, they may aid us.

The language of chapter 60 closely follows that of the Soldiers' Preference Act enacted by the New York Legislature, and the decisions of the courts of that state with reference to the legislation have quite frequently been referred to by this court.

In People ex rel. Crummey v. Palmer, 152 N. Y. 217, 219, 46 N. E. 328, 329, the duties of the defendant, as chief financial officer, were such that it was impossible for him to personally discharge them. The relator's duties consisted of filing bills and vouchers as they came in and producing them when called for, and in the absence of the warrant clerk making out the warrants for the signatures of the proper officers, and in keeping track of liens filed and attachments levied on claims in the office. He was a veteran and asked reinstatement by mandamus. In holding the writ should have been denied, the court said:

"What is a 'confidential relation' to the appointing officer? A complete definition may be difficult. We shall only attempt

one in general terms. The meaning of 'confidential' has two elements, that of secrecy and that of trust and confidence. * * * Such a relation-arises whenever a continuous trust is reposed by one person in the skill or integrity of another. The statute which we have under consideration has reference to officials, and the confidential relations mentioned undoubtedly have reference to official acts, and include not only those that are secret, but those that involve trust and confidence which are personal to the appointing officer. If, therefore, the statute casts upon an officer a duty involving skill or integrity, and a liability either personal or on the part of the municipality which he represents, and he intrusts the discharge of this duty to another, their relations become confidential. * * * It will thus be seen that the greater portion of the duties devolving upon the relator's position involved skill and integrity, and if the duties were carelessly or negligently performed, it might result in great loss either to the comptroller or the city. * * * as a faithful officer he [the comptroller] would be interested in protecting the interests of the city and in the saving of it, as well as himself, from responsibility. It appears to us that the position is one requiring trust and confidence, and that it is, within the provision of the statute, a confidential relation to the appointing officer.''

In Chittenden v. Wurster, 152 N. Y. 345, 360, 46 N. E. 857, 861, 37 L. R. A. 809, plaintiffs sought to restrain the payment of salaries to certain officers because they had not taken the competitive examinations required by the civil-service laws, and their appointments were, therefore, alleged to be illegal. In reversing a decree for the plaintiffs, the court, referring to the case of People ex rel. Crummey v. Palmer, supra, 152 N. Y. 217, 46 N. E. 328, said:

''That case arose under another statute, but was so closely akin to that under consideration as to give it an important bearing. We then regarded and still consider that case upon the border line, beyond which we should not go. We then were of the opinion that where the duties of the position were not merely clerical, and were such as especially devolved upon the head of the office, which, by reason of his numerous duties, he was com-

pelled to delegate to others, the performance of which required skill, judgment, trust and confidence and involved the responsibility of the officer or the municipality which he represents, the position should be treated as confidential. We have not changed our views upon the subject.''

The court in that case was urged to limit positions in the confidential class to those which are strictly secret, but it held that ''such a construction would be too narrow and burdensome, and we think not justified.''

In People ex rel. Flood v. Gardiner, 157 N. Y. 520, 52 N. E. 564, mandamus proceedings had been brought by the relator to compel the defendant, district attorney of New York County, to reinstate him as a ''subpoena server.'' The lower court had denied the writ and this ruling was reversed by the appellate division, which held the position was not ''strictly confidential,'' and not within the exception in the veterans'-preference law. The court of appeals reversed the appellate division. The word ''strictly'' had been added to the statute since the matters involved in People ex rel. Crummey v. Palmer, supra, had happened, but the court held that the rule in that case and in Chittenden v. Wurster, supra, fully supported the holding of the court that the position was ''strictly confidential.'' The court held that while the officer simply served the subpoenas, he was often familiar with the facts in the case and knew what the testimony of the witnesses would be, and by connivance with those on the other side by disclosing to them the names of the witnesses and what they would testify to could greatly injure the prosecution.

In Davies v. City of Pittsburgh, 252 Pa. St. 251, 255, 97 A. 413, 415, a writ of mandamus was prayed for to reinstate plaintiff as chief clerk of the department of public service. The statute exempted one confidential clerk to certain offices and departments. In upholding a denial of the writ, the supreme court said:

''The term 'confidential' is not necessarily limited to such position as involves matters of secrecy, but includes those which involve trust and confidence in the person occupying the particular employment. Any relation in which one person represents

another in the performance of duties involving skill, integrity and trust is a confidential one within the general legal acceptation of the meaning of that term.''

Citing People ex rel. Crummey v. Palmer, supra, 152 N. Y. 217, 46 N. E. 328. For like comment, see People ex rel. Sweet v. Lyman, 157 N. Y. 368, 52 N. E. 132, 138; People ex rel. Johnson v. La Roche, 111 Misc. Rep. 465, 181 N. Y. S. 611; Scott v. Brown, 90 Ind. App. 367, 157 N. E. 64, 68; 15 C. J. S., Confidential, 822.

The case of Allen v. Wegman, 218 Iowa 801, 254 N. W. 74, was one very fully considered and discussed by the court, and there was considerable diversity of opinion among the members. It was a certiorari proceeding by the plaintiff to test the legality of his discharge by the defendant. He is referred to in the record as the head bookkeeper, or as having general charge of the bookkeeping in the treasurer's office. His principal duties, however, were to post in a loose-leaf ledger some seventy or more departmental accounts, which were further subdivided into some three hundred accounts. He did his posting from the warrant-redeemed register and from the journal, which were kept by other employees. His ledger was supposed to be kept posted to date so that the balance in any particular fund on any particular day could be readily ascertained. The court stated that the duties of his office required that the treasurer delegate this part of his work to others of competency, integrity, and trust, for performance. The court, in the majority opinion by Justice Anderson, concurred in by four associates, held the position to be ''strictly confidential,'' and also that the plaintiff was incompetent in his work. Two other members of the court specially concurred on the latter ground. Justice Evans dissented on this ground, holding that there was no proper evidence of incompetence, and further that the Soldiers' Preference Law had no application, since plaintiff's tenure of office ended automatically with the tenure of his appointing principal. Such is the holding in Lockwood v. Stoll, 264 Mich. 598, 250 N. W. 321. Justice Stevens dissented upon the ground that plaintiff's bookkeeping duties did not make his position confidential in character. The opinion of the court cited and quoted with approval the prin-

ciples stated in the New York and other cases referred to herein.

In Hannam v. Iowa State Commerce Comm., 228 Iowa 586, 292 N. W. 820, the plaintiff, by certiorari, sought his reinstatement as a general inspector in the motor-carrier department of the defendant. This court affirmed the annulment of the writ, and speaking through Justice Hamilton, quoted with approval from Allen v. Wegman, supra, and People ex rel. Sweet v. Lyman, supra, 157 N. Y. 368, 52 N. E. 132, 138, in holding the position "strictly confidential."

The question was next before this court in Bowman v. Overturff, 229 Iowa 329, 332, 294 N. W. 568, 570, a proceeding by certiorari to restore the plaintiff to his position as "turnkey" of the Polk county jail. In affirming an annulment of the writ, the court said:

"Our views are fully set forth in the following decisions of this court: Allen v. Wegman, 218 Iowa 801, 254 N. W. 74; Hannam v. Iowa State Commerce Comm., 228 Iowa 586, 292 N. W. 820. The duties devolved upon Mr. Bowman, whether designated 'jailer' or 'turnkey', are those imposed by statute upon the sheriff, but which, by reason of his numerous duties, he was compelled to delegate to others. These duties were such as require skill, confidence and integrity and strict loyalty to his superior officer, the sheriff, and, while not designated as a 'deputy', he was appointed as a substitute for the sheriff in the performance of the special duties to which he was assigned and, in the performance of those duties, he was acting as a special deputy to the sheriff and he must be held to have sustained what is referred to in the statute, section 1165 of the 1935 Code, as 'a strictly confidential relation', and that his appointment was from year to year."

Our last pronouncement on this question was in Brown v. State Printing Board, 230 Iowa 22, 24, 296 N. W. 719, 720, in which the plaintiff petitioned for a writ of certiorari to restore him to the office of State Superintendent of Printing, from which he had been discharged by defendant board. The statute authorized his appointment by the board to "serve during the pleasure of the board." (Code section 213.) In his work of enforcing state printing contracts, in preparing specifications and adver-

tisements for printing, and in performing incidental duties, or such as the board might order, he acted under its direction. The court refers by citation and quotation to the decisions of our own and other courts referred to herein, and states:

"Where duties are not merely clerical and require skill, judgment, trust and confidence, the courts are inclined to regard the appointee to whom such duties are delegated as holding a strictly confidential relation to the appointing officer or board. * * * The statutes contemplate a delegation of authority from the board to the superintendent, and the duties imposed upon the superintendent involve skill, judgment, trust and confidence. They are not merely clerical in nature."

The opinion, written by Justice Garfield, was concurred in by all associate justices.

It is the contention of the appellee that his work was largely clerical and consisted in the examination of public county records throughout the state, concerning which he made reports to the auditor of state, which reports as well as the records examined were at all times open to public inspection. He further urges that the record shows that nothing of a confidential nature passed between the auditor and himself, and that he never conferred with the auditor concerning the performance of his duties, never worked in the auditor's office, and never had access to any funds therein. There is no question but that the record supports these statements of fact. But it is also undisputed that the appellee was under the direction of the supervisor of county examiners and had all of his contacts and conferences with him. Appellee insists that there must be a *personal* confidential relation between the employee and the appointing officer, and cites in support thereof People ex rel. Tate v. Dalton, 41 App. Div. 458, 58 N. Y. S. 929; O'Keefe v. Clark, 238 App. Div. 175, 264 N. Y. S. 299; Volgenau v. Finegan, 163 Misc. 554, 296 N. Y. S. 101; and People ex rel. Drake v. Sutton, 88 Hun 173, 34 N. Y. S. 487, 68 N. Y. St. 494.

Appellee refers to the fact that the legislature, by using the adverb "strictly" to qualify the term "confidential relation," intended to restrict the relation clearly and unmistakably to a confidential relation. Cited in support thereof are People

1324

ex rel. Speight v. Coler, 31 App. Div. 523, 52 N. Y. S. 197; Union Ice & Coal Co. v. Town of Ruston, 135 La. 898, 66 So. 262, L. R. A. 1915B, 859, Ann. Cas. 1916C, 1274; and State ex rel. Tamminen v. City of Eveleth, 189 Minn. 229, 249 N. W. 184, 99 A. L. R. 289. There can be no question that the legislature had a purpose in using the qualifying adverb, and it should be given its accustomed meaning.

Appellee also relies upon Merritt v. Kraft, 71 Misc. Rep. 492, 129 N. Y. S. 636, as disposing of all contentions urged by appellant on this issue. This is the opinion of the nisi prius court at the original trial, and it may be noted that it was reversed upon appeal to the appellate division of the Supreme Court of New York, as reported in People ex rel. Merritt v. Kraft, 145 App. Div. 662, 130 N. Y. S. 363, which latter decision was affirmed by the New York Court of Appeals in a memorandum opinion found in 204 N. Y. 626, 97 N. E. 1114.

Appellee also insists that since the trial court found that no strictly confidential relation existed and that there is substantial evidence to support such finding, this court is bound thereby, the case not being triable de novo here. It is true that this appeal is not triable anew by this court, and that therefore we are bound by any findings of the trial court on strictly fact matters. But the determination of the relationship between Klatt and Akers is not a finding of a simple question of fact. A confidential relationship is a legal status. It is a conclusion of law, rather than a finding of fact, a matter for judicial construction and determination. Chittenden v. Wurster, supra, 152 N. Y. 345, 46 N. E. 857, 861. Furthermore, the facts upon which that issue was based are undisputed. In re Dorrance's Estate, 309 Pa. 151, 156, 163 A. 303, 304, the question was one of domicile. That court said:

"The determination of decedent's domicile in this appeal is a conclusion of law, based upon facts, most of which are undisputed. Furthermore, this case falls within the rule stated in Hindman's App., 85 Pa. 466, 470, that where a finding of fact is simply a deduction from other facts reported by the tribunal under review, and the ultimate fact in question is purely the

result of reasoning, we are competent to judge of its correctness and will draw our own conclusions from the facts as reported.''

An identical finding of fact was made by the trial court in Allen v. Wegman, supra, 218 Iowa 801, 254 N. W. 74, but this court disregarded it and found to the contrary.

It is apparent from the statutes and from the record in this case, that examiners and assistant examiners must be close-mouthed men, of ability, integrity, and fidelity, since in their examinations and investigations they acquire knowledge of matters affecting not only public officials but also private individuals, which is highly confidential and should be disclosed to no one except as their duties require disclosure to their superiors. Much of this information does not and should not appear in their filed reports. Each of these examiners audits accounts and transactions amounting to many thousands of dollars each year. These include the purchases of various instrumentalities, materials, and supplies. Such transactions many times involve the opportunity and temptation to graft. The auditor of state has a responsibility to discover such delinquencies, and bring about restitution, and to enforce, as far as possible, the strictest honesty in the administration of official and departmental finances. The responsibility is his and the right to select examiners with the necessary qualifications to perform the obligations and duties of his office has been granted to him by the legislature.

From the provisions of chapter 10 of the Iowa Code, and from the testimony of the witnesses in this case, material portions of which we have set out, there can be little question that the position which the appellee held was one that was strictly confidential to the appellant. It involved all the generally accepted elements of such a relationship, position, or office—secrecy, integrity, trust, confidence, skill, competence, in the performance of its duties. These duties were by statute made the responsibility of the appellant. The burden was upon him to see that they were properly performed. It was impossible for him to perform them personally. The legislature recognized this and authorized him to delegate such part of these duties as he could not give personal attention to others. But he was, nevertheless, responsible for their proper performance. The statute

placed them under his direction at all times. It was his duty and his right to select those in whose integrity, ability, and trustworthiness he had implicit confidence. He owed that duty to himself, individually, and, as auditor of the state, to every department of the state, to every municipal subdivision of the state subject to his examination, and to the state itself. Appellee contends that secrecy is an essential to a confidential position, and that it was not an element of this one, since the records and accounts examined and the reports filed by the examiners were open to public inspection. The argument is without merit. The legislature, understanding the nature of the work, by Code section 123, made secrecy a requisite of the position, enforceable by removal. The examinations are begun without notice to the office or department. The examiners are, of course, required not to disclose the contemplated investigation to the officer or department. Ordinarily no serious irregularities are found, but the record discloses that the examinations have uncovered defalcations. Such a defaulter or embezzler would not hesitate to attempt to purchase such protection as an examiner might furnish him by not disclosing incriminating matters found in the records. The position required a trustworthy person who would not yield to such temptations. During the time that the evidence is being gathered and the facts definitely ascertained, it is essential that there be no disclosure to outsiders or to the one being investigated. Even though the first indications of wrongdoing ultimately prove baseless, fair treatment to the officer or department demands that there be no disclosures. No formal reports were made or filed until the matter was "nailed down," as one witness put it, and the details of the matter were not included in the report. The opportunity which the general public might exercise to examine the records of an officer would give little information of wrongdoing. The work of the examiners or the assistant examiners is not clerical, notwithstanding they must be expert in bookkeeping, correct accounting, and public-office finance, but their work also requires sound judgment, discretion, a general knowledge of pertinent statutes and laws, and oftentimes outside investigation. The examiners, in their work, were not under the immediate supervision of the state auditor. It

was necessary that they be men whom he could rely upon to work faithfully and efficiently without supervision.

A determination of other assignments of error is not necessary.

The judgment appealed from is, therefore, reversed.—Reversed.

WENNERSTRUM, C. J., and STIGER, SAGER, and HALE, JJ., concur.

GARFIELD, OLIVER, MILLER, and MITCHELL, JJ., dissent.

GARFIELD, J. (dissenting)—I respectfully dissent.

I think there is substantial evidence to support the trial court's conclusion that appellee was not "holding a strictly confidential relation to the appointing officer" and, since the case is not triable de novo here, that finding cannot be disturbed.

OLIVER and MILLER, JJ., concur in this dissent.

MITCHELL, J. (dissenting)—I find myself unable to agree with the majority and respectfully dissent.

I cannot agree with the holding that the position is one in which there is a confidential relationship. If in this position there is a confidential relationship, it would practically wipe out the Soldiers' Preference Act, for all positions with the possible exception of some minor jobs, like janitors or street-cleaning jobs, would come under the heading of confidential position. The case of Allen v. Wegman, 218 Iowa 801, 254 N. W. 74, is cited. I think there is a marked distinction between that case and this case. In the Allen v. Wegman case, the evidence shows that Allen was the head bookkeeper. He had general control of the bookkeeping department, also of all the books in the treasurer's office. He was entrusted with all accounts of the state, including all the various departments and trust funds. It was necessary for him to check the cash coming in and going out of the office and he had control of and access to this cash. There was a high degree of confidence and trust and mutual dependency between the state treasurer and the head bookkeeper in the performance of official duties. The head bookkeeper was the only person from

whom the state treasurer could obtain the balance in any particular fund on any particular day, which it was many times necessary for the state treasurer to ascertain. The state treasurer was pecuniarily responsible for the state funds to which the head bookkeeper had access since they had come into the treasurer's office and custody. In the case at bar, these auditors audited public accounts and records. Their reports were made to the state auditor and they were public records. To hold that these auditors held a confidential position would take from under the act almost every position on the theory that it was a confidential position. There are many cases cited in the briefs. The legislature gave to the veterans, or thought they gave to the veterans, a preference in all appointive positions.

There are many who argue against the Soldiers' Preference Act but that is a legislative right and the legislature of Iowa has seen fit to enact the Soldiers' Preference Law. It is the law of this state and it should be enforced.

I would affirm the lower court.