170 N.W.2d 243 (1969)
Laura S. RICHARDS, Appellant,
v.
BOARD OF CONTROL OF STATE INSTITUTIONS of the State of Iowa, Russell L. Wilson, Carroll Price, James W. Harrington, as Members thereof, Leonard W. Lavis, as Superintendent of Glenwood State Hospital-School, and Mrs. Emily Dunsdon, as Director of Nursing, Glenwood State Hospital-School, Appellees.
No. 53500.
Supreme Court of Iowa.
July 24, 1969.
Rehearing Denied September 15, 1969.
Thoma, Schoenthal, Davis, Hockenberg & Wine, Des Moines, for appellant.
Richard C. Turner, Atty. Gen., and Larry Seckington, Asst. Atty. Gen., for appellees.
BECKER, Justice.
Plaintiff petitions for Writ of Certiorari under the Soldiers Preference Law, section 70.6, Iowa Code, 1966. She alleges defendants illegally discharged her as program director of a specialized training project being conducted at the Glenwood State Hospital-School. After hearing the matter the trial court dismissed plaintiff's petition. She appeals. We affirm.
Defendant members of the Board of Control of State Institutions, Leonard W. Lavis, Superintendent and Mrs. Emily Dunsdon, Director of Nursing, at Glenwood, are all parties because of their official positions and actions as state officers.
The Glenwood State Hospital-School is authorized by chapter 222, Code, 1966 for *244 the treatment, training, instruction, care, habilitation and support of mentally retarded persons of this state. In July, 1964, Mr. Lavis, as Superintendent, made application for a federal grant for a proposed project for Inservice Training of Clinical Child Care Workers. The project had as its objective the improvement of general functioning of child care workers by supplying them with some of the special knowledge and techniques which professional specialists possess.
The program contemplated classes of active child care workers taught by the clinical instructor and various staff experts in the hospital on such subjects as physical therapy, speech therapy, hearing and special education.
To achieve the objectives of the projects it was necessary to hire a program director whose qualifications would be a registered nurse with a Master of Science degree and a clinical instructor who would also be a registered nurse but with a Bachelor of Science degree. Miss Richards, then resident of Minnesota, had a B.S. degree. She applied for and was hired as clinical instructor, commencing November 8, 1965. Two weeks later she was appointed acting program director.
Prior to being hired as clinical instructor, plaintiff was interviewed by Mrs. Dunsdon, Director of Nursing. Miss Richards testified: "Mrs. Dunsdon then took me to Mr. Lavis' office, and they both seemed to agree I would be able to do the program, and at that time they hired me for the position of clinical instructor at a salary of $7800. I arrived at Glenwood on November 8, 1965 and approximately 2 weeks thereafter, they asked me to be acting program director, as they had not been able to hire one. They were aware that I did not have a masters degree but asked if I would attempt to do the job anyway. Mr. Lavis would not approve a higher salary, but I told Mrs. Dunsdon I would accept the position anyway. I was not quite sure what my actual duties were to be as they were not explained, but I would imagine any program director would teach classes once in a while. They kept on looking for a program director but as I understand it, couldn't even get anyone to come for an interview."
Miss Richards did much work and observation in the wards. Friction developed between her and other staff people. The evidence shows serious misunderstandings concerning the aims of the project, the best method of achieving its purposes and the obligation due the federal government in connection with the grant. Classes were started but were unsuccessful.
In January plaintiff requested a meeting to discuss the project. It was clear to Mr. Lavis that problems were developing. Later Mrs. Dunsdon recommended that Miss Richards be fired. Mr. Lavis refused, pointing to the difficulties under which plaintiff was working and they agreed to continue for 90 days with Mrs. Dunsdon adding additional help to the project. The situation continued to deteriorate until the fall of 1966 when Mrs. Dunsdon orally advised Miss Richards she would be discharged. Mr. Lavis notified Miss Richards of her discharge by letter dated November 10, 1966.
Plaintiff asked for and received a hearing before the State Board of Control. The dismissal was confirmed. We hold the dismissal was within the power of the superintendent.
I. The two applicable statutes are: "70.6 Removalcertiorari to review. No person holding a public position by appointment or employment, and belonging to any of the classes of persons to whom a preference is herein granted, shall be removed from such position or employment except for incompetency or misconduct shown after a hearing, upon due notice, upon stated charges, and with the right of such employee or appointee to review by a writ of certiorari.
*245 "70.8 Exceptions. Nothing in this chapter shall be construed to apply to the position of private secretary or deputy of any official or department, or to any person holding a strictly confidential relation to the appointing officer." Code of Iowa, 1966.
Chapter 70, Soldiers Preference Law, is a general statute governing all appointments to and removals from positions in the public service in Iowa. Andreano v. Gunter, 252 Iowa 1330, 1341, 110 N.W.2d 649. Plaintiff is a veteran of World War II and was employed by the state in the position above described. Defendants contend the statute does not apply to plaintiff because she holds a strictly confidential relation to the appointing officer. The trial court so found.
This appeal from the trial court's action on a petition for certiorari is not de novo. However, it has been held that the question of a strictly confidential relationship is one of law, not of fact, and thus a matter for judicial construction and determination. Klatt v. Akers, 232 Iowa 1312, 1324, 5 N.W.2d 605, 146 A.L.R. 808 (by a divided court, 5 to 4); Dennis v. Bennet, 258 Iowa 664, 140 N.W.2d 123, 127. The point is of little moment here because our review of the record convinces us that the position Miss Richards held was in the strictly confidential relation category as the term has been defined by this and other courts.
II. The question of when a person is holding a strictly confidential relation to the appointing officer has always been troublesome. Klatt v. Akers, supra. In Dennis v. Bennet, 258 Iowa 664, 140 N.W.2d 123, 127, we recently reviewed the applicable principles recognized by this court in determining the existence of a statutory confidential relation: "By a process of adoption, we said in Brown v. State, Printing Board, 230 Iowa 22, 24, 296 N.W. 719, 720: `"`The term "confidential relation" is a very broad one and is not at all confined to any specific association of the parties, but applies generally to all persons who are associated by any relation of trust and confidence.'" '
"In like manner we also there said: `"* * * where the duties of the appointing officer were of such a character that it is impossible for him to personally discharge them, and of necessity he was compelled to intrust the performance of them largely to others, a confidential relation arose between the officer and the others to whom a portion of his duties was necessarily delegated."'
"Following this we then, by our own authority, said: `Where duties are not merely clerical and require skill, judgment, trust and confidence, the courts are inclined to regard the appointee to whom such duties are delegated as holding a strictly confidential relation to the appointing officer or board.'
"In this connection, the court in Feider v. Hanna, 172 Cal.App.2d 201, 342 P.2d 344, 346, said: `A confidential position has been defined as one "where the duties of the position were not merely clerical, and were such as especially devolved upon the head of the office, which, by reason of his numerous duties, he was compelled to delegate to others, the performance of which required skill, judgment, trust, and confidence, and involved the responsibility of the officer or the municipality which he represents, * * *.'" See also 15 Am.Jur.2d, Civil Service, section 15, page 477.
"Surely the legislature did not intend section 70.8 to be a tool by which the provisions of chapter 365 could be loosely circumvented."
We also here recognize the legislature did not intend section 70.8 to be a tool by which the rest of chapter 70 could be loosely circumvented. Nevertheless we are convinced the position held by Miss Richards placed her in a position of strictly confidential relation to the appointing officer, Mr. Lavis.
*246 Examination of the record and exhibits demonstrates that the ultimate responsibility for both the interpretation and success of this training project rested on Mr. Lavis. By statute the superintendent has the custody control and management of all patients. Section 222.4(4), Code, 1966. He signed the application for the federal grant and, as supervisor, was responsible to the grantee for interpretation and implementation of the project. Ideally, the project would affect and benefit the entire institution. The superintendent must necessarily delegate to the project director authority to interpret and implement the program in the institution. This was done.
The relationship is not similar to the fire chief-superintendent of public safety situation considered in Dennis v. Bennet, supra. The duties of the fire chief are delegated by statute and ordinance on the chief and are not duties imposed on the superintendent of public safety. Hence this court held section 70.8 did not apply to a fire chief. The appointing officer could not delegate to the subordinate any powers or duties he did not possess. We find just the opposite situation here. Mr. Lavis did have powers and duties devolving upon him which he necessarily delegated to Miss Richards. The position of program director had a strictly confidential relationship to the appointing officer, the superintendent of the institution.
III. Our holding in Division II renders plaintiff's remaining assigned errors moot. The friction which developed in giving birth to this worthy project was unfortunate. It is unnecessary to decide whether this situation was due to lack of understanding on all sides or to the claimed incompetence of plaintiff. In either event the superintendent had the power to discharge plaintiff when in his judgment her performance, for whatever reason, became unsatisfactory
Affirmed.
All Justices concur.