WALDO HURTIG, administrator of estate of Vicki Hurtig, deceased, appellant, v. ORVILLE BJORK, appellee.

No. 51822.

(Reported in 138 N.W.2d 62)

NOVEMBER 16, 1965.

Charles F. Knudson, of Marcus, and James, Greer, Nelson & Bertell, of Spencer, for appellant.

Cornwall, Cornwall & Avery, of Spencer, and Smith & Grigg, of Primghar, for appellee.

GARFIELD, C. J.—Waldo Hurtig, as administrator of the estate of his little daughter Vicki, brought this law action to recover for her death from injuries received when struck by defendant Bjork's auto after she alighted from a school bus. Defendant admitted liability and the amount of recovery was submitted to a jury which returned a verdict of $28,000. On defendant's motion for new trial the court ruled this was excessive and ordered a new trial unless plaintiff remitted $16,000 from the verdict. Plaintiff appealed from this order.

The single assigned error asserts the verdict is sustained by sufficient evidence, is not excessive and not the result of passion and prejudice of the jury.

Vicki was fatally injured December 19, 1963, about 5 p.m. Her age was five years, ten months and 21 days. She died at 8:05 the same evening from a basal skull fracture. According to the 1958 mortality table approved by the state commissioner of insurance, found at page 2728, Code, 1962, the life expectancy of a child of six is 63.27 years, and of a person 21 it is 49.46 years.

I. The measure of damages in this state for death of a minor is well settled. It is correctly stated in instruction 3.10b of Iowa Uniform Jury Instructions prepared by a committee of the Iowa State Bar Association. The trial court used it here in instruction 7. It states in part:

"The measure of damages for the death of Vicki Hurtig, a minor, will be the present worth or value of the estate which she would reasonably be expected to have saved and accumulated as a result of her own efforts from the date of her majority, if she had lived out the term of her natural life. * * * In determining that amount you shall exclude the sum which she would have accumulated from the date of her death to the date of her attaining her majority.

"In estimating such damages, if any, you may and should consider the evidence on the expectancy of life of Vicki Hurtig, deceased, her health, physical and mental condition, her morals, her habits as to industry, thrift and economy, her interest in school, her grades and attendance, the occupation of her father, the contingencies of life such as ill health, unemployment, increase or diminution of earning capacity as age advances, and all other facts and circumstances in the evidence tending to show the amount, if any, that her estate might have accumulated from the date of her majority if she had not met death in the accident * * *."

To the sum arrived at under instruction 7 two other sums could properly be added under instructions 8 and 9 : 1) Interest on the reasonable funeral expense for such time as it was prematurely incurred, not to exceed $921, the amount of such expense. Soreide v. Vilas & Co., 247 Iowa 1139, 1153, 78 N.W.2d 41, 49, and citations; Mallinger v. Brussow, 252 Iowa 54, 57, 105 N.W.2d 626, 628. 2) Such amount as will fairly and reasonably compensate for the pain and suffering of decedent during the three hours she survived the accident. Iowa Uniform Jury Instruction 3.9; Fitzgerald v. Hale, 247 Iowa 1194, 1205, 78 N.W.2d 509, 515, overruling prior contrary decisions.

No objection to any instruction was made. Plaintiff's counsel announced there was none. The instructions therefore stand as the law of the case. Neibert v. Stone, 247 Iowa 366, 368.

73 N.W.2d 763, 764, and citations; Mallinger v. Brussow, supra, 252 Iowa 54, 61, 105 N.W.2d 626, 630. We will refer to other applicable legal propositions following an outline of the evidence.

II. Vicki was the second of four children—all girls—born to her parents. She was in her first year at a Lutheran school in Paullina; she was obedient, did her schoolwork well, had an A grade, got along well and was liked by schoolmates, was happy, healthy, prompt, neat, clean and "real pretty." She put small coins in a piggy bank the little girls had.

Vicki's father, Waldo, was a trucker, 31 at time of trial in November 1964. He married Ila, Vicki's mother, when she was 16. Each attended school to the eighth grade; this is also true of Waldo's parents. Ila had a cerebral hemorrhage in 1955 which left her with some paralysis and she never fully recovered. She died at 21 in November 1959 when her fourth child was born. Waldo was in the army 23 months, was a corporal when discharged early in 1956. He had worked on farms before his army service. After his army discharge he farmed 160 acres of his grandmother's five years. He then started trucking in February 1961.

Waldo received $325 a month for 13 months on his first trucking job. He then changed employers and was paid $80 a week. For the 18 months just preceding trial he drove a truck for a third employer, a Farmers elevator, at $100 a week plus a bonus arrangement of $15 to $17. He had a 1959 Dodge car, 50 hens, six ducks, furniture, appliances and household goods. He estimated his net worth at $3500. He and Ila had saved $2200 when they started farming. Waldo had a life insurance policy for $10,000 on which the premiums were deducted from his wages for the 18 months of his last employment. He did not know its value.

Waldo had total doctor and hospital bills between $6000 and $7000 which he paid except for a $25 doctor bill; Vicki's burial expense of $921 was also unpaid. Ila was confined in an army hospital and a hospital in Cherokee after her "stroke." The third child was hospitalized in Sioux City two to two and one-half months. At time of trial Waldo and family occupied, rent free,

the dwelling on a farm of his grandmother's near Paullina. The buildings would otherwise be unoccupied.

After Ila died Karen Jones, 24 at time of trial, went to take care of the family in August 1960 at the farm they were occupying. Waldo and Karen were married March 13, 1961. Karen's daughter, born out of wedlock, also went to live with Waldo and his little girls. Karen took excellent care of the children. She had quit school in her second year of high school.

Waldo's mother, Lucille, was 50 at time of trial. Her father died when she was a year old. Her mother was still alive at 77. Waldo's father, William, was 51 at time of trial. William's father died from a heart attack at 62. His mother was still alive, also at 77. William and Lucille owned a farm of 160 acres in Iowa and one of 200 acres in Minnesota. Lucille testified, "I inherited this land from my father—that is, I inherited $3000." Whether either farm is free from incumbrance and where in Minnesota the one farm is located do not appear.

Ila's father, Clarence (Vicki's maternal grandfather), was 60 at time of trial; Ila's mother, Mable, was 55. Clarence's father died of hardening of the arteries at 69, his mother of cancer at 68. Clarence owned 300 acres of land. Whether it was incumbered does not appear . He testified, "My father owned land before I did." His wife said her husband acquired some property from his parents when they died. Mable's father died at 84, her mother at 79. The father owned land at one time but not at his death.

A professor at a small college in Orange City testified he foresees continued rising prices and a depreciating dollar because of heavy expenditures by government, business and consumers. An income of something like $7400 would be needed to match one of $3000 in 1939 and an acre of land would cost more than double its cost in 1939 because the purchasing power of the dollar has declined more than half in that 25-year period.

A retired banker of long experience said four percent is a safe return on an investment in savings and loan associations, banks and government bonds; first mortgages on farms would pay five and one-half percent but are hard to obtain; the low land value in the last 46 years in the area where the parties lived

was $150 per acre; no dramatic fluctuation has occurred in the return on safe investments in the last 40 to 45 years.

A certified accountant testified to amounts a dollar, invested at four percent and also at five percent, would equal in given periods. A dollar invested at four percent for 49 years would equal $6.83, at five percent for that time would equal $10.92, at four percent for 63 years would equal $11.83, and at five percent for that time would equal $21.62.

Vicki was severely injured. She suffered a broken shoulder and upper arm, a punctured lung and a basal skull fracture. A salesman lifted her from the highway, carried her into the home and placed her on a bed. She was limp and "completely out." An osteopathic physician arrived in a few minutes and examined her 15 to 20 minutes. When he moved her arm Vicki indicated pain. He did not think she "was injured that severely."

Vicki was taken some 20 miles by ambulance at high speed to a Cherokee hospital. She arrived about 5:45, apparently unconscious, but regained consciousness in a few minutes. An unconscious person does not suffer pain. Part of the time Vicki was in the hospital she was semiconscious and felt pain although less than if she were conscious.

Vicki's father and stepmother were attending a trucker's convention in Sioux City when the accident occurred. They reached the hospital about 7:15 and saw Vicki briefly. She told her stepmother, "Mommy, my head hurts." This was the only coherent statement any witness heard from her. At times she cried out incoherently.

III. Our problem is whether it was an abuse of discretion for the trial court to hold the verdict was excessive as not sustained by sufficient evidence.

"* * * The trial court has broad discretion in granting a new trial conditioned upon a remittitur to a set amount. We will not interfere with its ruling on a motion for new trial unless there appears to have been an abuse of discretion. [Citations] This discretion extends to the amount of the remittitur as well as the decision to grant or refuse a new trial." Grant v. Thomas, 254 Iowa 581, 584, 585, 118 N.W.2d 545, 548; Larew v. Iowa State Highway Comm., 257 Iowa 64, 68, 130 N.W.2d 688, 690.

█ Nelson v. Iowa State Highway Comm., 253 Iowa 1248, 1254, 115 N.W.2d 695, 698, states, "The trial court has greater powers in granting a new trial or ordering a remittitur because of the size of the verdict than we do." See also Burke v. Reiter, 241 Iowa 807, 817, 42 N.W.2d 907, 913, and citations; Steensland v. Iowa-Illinois Gas & Elec. Co., 242 Iowa 534, 536, 537, 47 N.W.2d 162, 163, and citations.

█ In re Estate of Hollis, 235 Iowa 753, 759, 16 N.W.2d 599, 602, a leading case, says: "The question of whether the verdict was excessive was not one of law but was a question of fact under the record made, and the answer was one resting in the legal discretion of the court." Among later precedents which approve the Hollis case is Nichols v. Snyder, 247 Iowa 1302, 1312, 78 N.W.2d 836, 842. It repeats what is just quoted.

It is so well established that authorities need not be cited in support of the proposition we are slower to interfere with the grant of a new trial than with its denial. Rule 344(f)4, Rules of Civil Procedure.

We have spoken at least three times on the effect of the declining purchasing power of the dollar in cases of this kind. Tedrow v. Fort Des Moines Community Services, 254 Iowa 193, 203, 204, 117 N.W.2d 62, 68, perhaps our latest expression on this point, states:

█ "We realize, of course, that the dollar is not what it used to be. Its purchasing power cannot fairly be compared with its value in the decades before the second world war. * * * It is also pertinent to say, as we have done before, that the present considerable devaluation of the purchasing power of our money, coupled with burdensome taxes, makes the problem of saving and accumulating much more difficult. This bears directly upon the amount of the estate a decedent might have accumulated but for his wrongful death. Hackman v. Beckwith, 245 Iowa 791, 808, 64 N.W.2d 275, 285; Soreide v. Vilas & Co., supra, 247 Iowa 1153, 78 N.W.2d 49, 50."

█ IV. As explained in Division I hereof, the measure of plaintiff's recovery for the child's death to be applied here is the present worth of the estate she would reasonably be expected to save and accumulate as a result of her efforts after reaching her

majority if she had lived out her natural life. However, in computing present worth the child's entire life expectancy is to be used. Hively v. Webster County (Ladd, J.), 117 Iowa 672, 91 N.W. 1041; Note 48 Iowa Law Review 666, 687. Thus, theoretically, the sum allowed could be drawing interest for the 15 years before the time decedent would be entitled to any of her earnings if she had lived.

Nine hundred twenty-one dollars ($921) is the maximum that might be allowed under the court's instructions for burial expense. It would seem clear it would not be an abuse of discretion for the trial court to hold $1000 is the largest award the evidence warrants for pain and suffering during the three hours Vicki survived the accident. She was either unconscious, with no pain, or only semiconscious, with reduced pain, during much of this brief interval.

This would leave $26,079 of the jury verdict as the present worth of what this little girl would reasonably be expected to accumulate from her efforts from the date of her majority if she lived her natural life. As stated, according to the mortality tables received in evidence the normal expectancy of a child of six is 63.27 years and of a person 21 it is 49.46 years. According to the record, $26,079, invested for 63 years at four percent, would equal some $308,000; and at five percent it would equal some $563,000.

We are not persuaded it would be an abuse of discretion for the trial court to conclude, as he might well have done, it is most improbable, under this evidence, that Vicki would accumulate from her efforts any such sum commencing from the time of her majority if she had lived. If the remittitur ordered here had been filed, $10,079 of the verdict would remain as the present worth of what the child would have accumulated from her efforts after majority. This sum, invested for 63 years at four percent, would equal some $119,000; and at five percent it would equal some $217,000.

Many of our decisions point out that comparison of verdicts is not a satisfactory method for determining whether an award in a particular case of this kind is excessive—each must be determined upon the evidence therein. Soreide v. Vilas & Co.,

supra, 247 Iowa 1139, 1153, 78 N.W.2d 41, 50, and citations; Brophy v. Iowa-Illinois Gas & Elec. Co., 254 Iowa 895, 900, 119 N.W.2d 865, 867. See also Tedrow v. Fort Des Moines Community Services, supra, 254 Iowa 193, 202, 117 N.W.2d 62, 67.

Nevertheless we may observe that this jury verdict is nearly twice as large as any award for death of a minor approved by this court. The largest such amount in any Iowa precedent called to our attention is $15,000 in the Tedrow case, supra. The jury verdict there was $22,500 for death of a 12-year-old girl *which the trial court approved.* Nevertheless, our unanimous decision (except for one judge who took no part) ordered a remittitur of all above $15,000.

If this jury verdict had been approved by the trial court and had come here upon defendant's appeal with a claim it was excessive as not sustained by sufficient evidence, perhaps we would have ordered a somewhat smaller amount remitted than did the trial court. We think this consideration would not justify a partial reduction of the remittitur here. Plaintiff does not suggest, and perhaps does not desire, such action by us. As indicated at the outset hereof, he asks that the entire verdict be reinstated. Then, too, for us to reduce the amount of the remittitur would seem to be inconsistent with the rule repeatedly stated by us that the trial court has greater discretion than we do in such a ruling as that appealed from. No case of this kind has come to our attention in which we have ordered a reduction in the amount the trial court ordered remitted.

V. No question of allowance of interest on the award is presented. The trial took place less than a year after the child's death. However, upon another trial this period will be more than doubled and the allowance of interest will assume increased importance. We deem it proper to call attention to the fact that interest on the award from date of death may be allowed. See Bridenstine v. Iowa City Elec. Ry. Co., 181 Iowa 1124, 1135-1137, 165 N.W. 435; General Mills, Inc. v. Prall, 244 Iowa 218, 221, 56 N.W.2d 596, 598; Sisson v. Weathermon, 252 Iowa 786, 799, 800, 108 N.W.2d 585, 592, 593; Note 48 Iowa Law Review 666, 690, 691.

Since it does not appear the order appealed from was an abuse of the trial court's discretion it is—Affirmed.

All JUSTICES concur except JUSTICE BECKER, who dissents.

BECKER, J.—I dissent.

I. The courts have power to grant new trials conditioned on remittiturs. At least since 1864, this court has assumed and exercised such power. Brockman v. Berryhill, 16 Iowa 183. At least since 1822, the federal courts have sustained like rulings. Blunt v. Little (C. C.), 3 Mason 102 Fed. Cas. No. 1578. But each time a verdict is set aside, the right to a jury trial is, to that extent invaded, despite the admonition of Article I, section 9, of the Iowa Constitution. "The right to a jury trial shall remain inviolate * * *."

The courts have so long exercised the right to order a remittitur, or in the alternative a new trial, that little attention is now given to the fact that this right is in derogation of the basic constitutional right quoted above.

The constitutional problem is recognized by others.

"The motives of judges who easily remit excessive jury verdicts can be appreciated. That the practice will hasten the termination of civil suits, decrease expenses to the litigants, reduce the number of retrials, and help to clear congestion in the courts is recognized. However, serious problems remain in regard to invasion of the jury's province and violation of the litigants' constitutional right to a jury trial. The application of some fictitious standard to determine whether a jury verdict is excessive often results in the rather undesirable practice of an appellate court substituting its opinion for the jury's on a factual determination. 'Judges, as judges of the facts, have all the faults, but not all the virtues of juries.' " Remittitur of Jury Verdicts in Iowa, 48 Iowa Law Review 649, 665.

See Dimick v. Schiedt, 293 U. S. 474, 55 S. Ct. 296, 79 L. Ed. 603, 95 A. L. R. 1150. MR. JUSTICE SUTHERLAND recognized for the majority of the Supreme Court of the United States, when considering the propriety of imposing additurs as a condition to prevent granting a new trial, that a constitutional problem does exist.

This is not to say that courts do not have the constitutional power to grant remittiturs as an alternative to a new trial. The practice is too firmly imbedded in our system for any such judicial change. But it is proper, and indeed necessary, that in using this power we remind ourselves that in so doing we invade the province of the jury. Constitutional powers can be unconstitutionally used.

It is probable that the tacit recognition of the fact that courts do invade the province of the jury gives rise to such statements as:

"Consequently, we find it difficult to reconcile the verdicts of certain juries and some of our cases in which we heretofore held some verdicts as excessive. In fact it is virtually impossible to do so. All we can do and should do is to leave the matter of the verdict to the jury in any particular case. Only when it can be affirmatively shown that prejudice and passion existed should this court interfere, or when there has been an apparent disregard of the evidence or of the law as given in the instructions. Grafton v. Delano, 175 Iowa 483, 492, 154 N.W. 1009; Engle v. Nelson, 220 Iowa 771, 784, 785, 263 N.W. 505. It has also been stated by this court that a further test for determining whether a verdict should be set aside because of its excessiveness or inadequacy is that it shocks the conscience. In re Estate of Hollis, 235 Iowa 753, 760, 16 N.W.2d 599, and cases cited." DeToskey v. Ruan Transport Corp. (1949), 241 Iowa 45, 49, 40 N.W.2d 4, 7, 17 A. L. R.2d 826.

JUSTICE WENNERSTRUM found it virtually impossible to reconcile Iowa cases on this subject in 1949 in DeToskey v. Ruan, supra. It is not unreasonable to observe that the situation has not improved in 1965. Of course DeToskey v. Ruan was one of the cases where this court decided not to reduce the verdict. Where we have decided that the verdict is too large, different emphasis is given to the phraseology used.

"However, even with our conclusion expressed in the preceding division, there remains the question of whether the amount allowed failed to administer substantial justice. If, although passion and prejudice does not appear, the verdict is so large that it appears to be beyond the limits of fair compensation

for the injuries shown, it is within our power, in fact it is our duty, to correct the error by requiring a remittitur on pain of a grant of a new trial. We must take care that we do not invade the province of the jury in so doing; but we have often held that such procedure is required to overcome a manifest mistake in the allowance made." Ferris v. Riley, 251 Iowa 400, 414, 101 N.W.2d 176, 184. To me, the last sentence simply gives lip service to a rule that is being violated in the two preceding sentences.

The fair compensation rule is noted in 48 Iowa Law Review at page 659 to be the most recent standard utilized. The author's conclusion seems justified that "this test will also lead to the substitution of the judge's opinion for that of the jury."

That analysis is correct. The confusion of cases that leads to the analysis is untenable. The jury's prerogative should not be invaded unless its actions do in fact shock the conscience, or clearly display passion and prejudice.

JUSTICE THORNTON spoke for the court in Mazur v. Grantham, 255 Iowa 1292, 1304, 125 N.W.2d 807, in setting aside a remittitur ordered by the trial court: "For us to interfere merely substitutes our judgment for that of the jury, this should be done with extreme caution." I would speak more strongly. Where judges are merely substituting their judgment for that of the jury they should not act at all! To do so is contrary to the constitutional mandate.

II. Failure to leave the question of damages in this case where it belongs has driven the majority to a rationalization that has been used before, Mallinger v. Brussow, 252 Iowa 54, 105 N.W.2d 626, but is difficult to justify. Using the loss to decedent's estate, i.e., that amount that decedent would have accumulated in the estate had decedent lived, reduced to its present worth, the majority shows that the real value of this award is not $28,000 but more than $308,000; albeit, in terms of the year 2026—63 years from date of death.

A thorough analysis of the pernicious effect of the rule that gives rise to such reasoning would be too long to be justified in this dissent but a short analysis is necessary. Fitzgerald v. Hale, 247 Iowa 1194, 78 N.W.2d 509, criticizes our historic interpretation of our survival statute, borrows from Chase v. Fitzgerald,

132 Conn. 461, 469, 470, 45 A.2d 789, 793, 163 A. L. R. 247, 252, and takes care of the pain and suffering element before death. The broader impact of Chase v. Fitzgerald under which the new Connecticut rule was set forth was ignored. Connecticut concluded:

"The rule for measuring damages resulting from death may then be briefly summarized as follows: *It is that sum which would have compensated the deceased so far as money could do for the destruction of his capacity to carry on life's activities as he would have done had he not been killed,* including the destruction of his earning capacity, for such time as he would probably have lived, but with due allowance for the effect which the ordinary vicissitudes of life might have had upon his continued enjoyment of those capacities and, as far as destruction of earning capacity is concerned, for the fact that a present payment will be made in lieu of sums which, had he lived, would have been received at periodic times in the future." (Emphasis added.)

Where then does such quotation take us in this case? The recovery is for more than accumulation to be expected and for more than merely lost earning capacity. The reduction to present worth under the foregoing rule would be for sums in connection with *earning capacity* "which, had he lived, would have been received at *periodic times* in the future." Thus the 63-year basis for determination of future value of the amount awarded would be unsound.

It will be said that we do not have the above rule in Iowa. This is true. But I cannot accept the reasoning in this case, designed to set aside a jury verdict, based on a rule that is clearly wrong. We need not here set aside our present rule to reinstate this verdict, but neither should we rely on the harshness of the rule in order to sustain the lower court's action.

It is deeply disturbing that the majority should resort to the $308,000—some 63 years hence—argument. The reduction to present worth is possible only after the determination of future earning capacity which does not lend itself to exact mathematical formulæ. As stated in Mallinger v. Brussow, supra, the award of damages for a wrongful death is necessarily at least somewhat of an approximation. This is why the jury plays such an important part in our system of jurisprudence.

III. The following articles criticize the rule we have adopted and perpetuated and urge its change. 11 Iowa Law Review 28; 5 Drake Law Review 98; 39 Iowa Law Review 45; 48 Iowa Law Review 666.

Significantly the 1963 article in 48 Iowa Law Review gives up hope that this court might do for wrongful death damages what it did for pain and suffering before wrongful death. Yet we have recognized our duty to act in these situations.

"Courts are properly slow to overrule a line of decisions, even though, as here, the change will affect no property rights or interests. Moreover, there is a rule of statutory construction that when a statute has received a judicial construction and is substantially re-enacted, such construction may be regarded as having been adopted by the legislature. 50 Am. Jur., Statutes, section 443; 82 C. J. S., Statutes, section 370b(1). However, these matters do not constitute a bar to the correction by a court of its palpable errors. They are merely factors to be weighed in determining the advisability of such correction." Fitzgerald v. Hale, supra, at pages 1204, 1205, of 247 Iowa.

This review is made because the majority postulates its reversal in part at least on a mathematical extension of the rule.

IV. In arriving at the $308,000 (or more) value to this estate the majority's argument ignores the cost of securing the judgment, that is, attorney fees, expert witness fees, and so forth. While we have consistently (and perhaps properly) ignored such mundane matters, I cannot believe that they should be ignored when using the formula for future worth of a verdict. It cannot be considered fair and sensible to multiply $26,079 by 11.83 and charge the estate with the future worth of that sum when we know that the estate is not going to get that sum.

V. The tactical maneuvering in this case resulted in a situation that reduced the possibility of passion and prejudice from record evidence to zero. Plaintiff did not request a jury. Defendant asked for a jury. Defendant then admitted liability and asked that the plaintiff be admonished not to offer evidence in connection with the liability aspects of the case. The record shows plaintiff's attorneys were so admonished, and apparently respected the ruling, for defendant does not complain. Therefore only damage evidence was presented to the jury.

The case was carefully tried. The observation of Federal District Judge Holtzoff (District of Columbia) is justified. "The court might add, in conclusion, that this is not a case where the jury might have been influenced by some dramatic circumstances or by some inflammatory remarks. Nothing of that kind occurred during the trial. Counsel for both sides tried this case on a very high plane and in a very objective, lawyerlike fashion." Reed, Admr. v. Gulf Oil Corporation, 217 F. Supp. 370, 373. If such remarks can be attributed to this case, and the record indicates they can, and if there was no evidence bearing on any subject but damages, the rationalization to support the trial court's actions simply cannot be placed on passion or prejudice on the part of the jury.

VI. The majority refers to unsatisfactory results of comparison of verdicts. This is true. However, I do not believe we should altogether ignore what is happening around us. See annotation, Excessiveness and inadequacy of damages for personal injury resulting in death of infant. 14 A. L. R.2d 550, Later Case Service, 1965, where cases involving the wrongful death of infants are collected, many exceed the amount the jury awarded here and many more exceed the amount that the trial court would have the plaintiff accept. This annotation gives force to the author's observation at 48 Iowa Law Review 649, 658:

"Other criteria have been employed by the Iowa court to determine whether a jury's award is excessive. One of these is whether the verdict is so clearly excessive that it shocks the judicial conscience. In applying this test the court reviews the record of the case and determines whether the damage award of the jury is so excessive as to be unconscionable. No attempt has been made to determine who or what the judicial conscience is, and it would appear that this 'conscience' may well be that of the individual judge urging his personal convictions in the case. At most, this conscience can be no broader than that of the Iowa court, for it would be extremely difficult to accept the notion that Iowa verdicts can be so large as to generally shock the judicial conscience when substantially larger verdicts are being affirmed in other jurisdictions."

VII. We should not make the present death and damage instruction the law of this case. "Parties to a litigation have no vested right in the court's mistakes to prevent their correction at any time before final judgment is entered." Weaver, J., in Darling v. Blazek, 142 Iowa 355, 358, 120 N.W. 961, 962.

Since the plaintiff may well elect to retry this case and since we make a point of the failure to seek a new rule of damages, plaintiff should be free to make a record on that matter on retrial.

VIII. Nothing has been said about the concept that human life does have value over and above what can be estimated by foreseeing the accumulation capacity of the human being. We do not yet recognize such concepts in our Iowa law. For my part, I think we could study the recent Michigan decisions with profit. Wycko v. Gnodtke, 361 Mich. 331, 105 N.W.2d 118.

This court may well continue to substitute its judgment and the judgment of the trial judge for that of the jury. However, it will require a verdict that does in fact shock my conscience within the social and economic framework of our age, before I can concur in such limitation, either by the trial court or this court, to the right of trial by jury.

I would reverse.