Robert D. ADAM, et al., Appellees,

v.

MT. PLEASANT BANK AND TRUST COMPANY, Appellant.

Ruth J. COUNTRYMAN, et al., Appellees,

v.

MT. PLEASANT BANK AND TRUST COMPANY, Appellant.

Nos. 85–712, 85–714.

Supreme Court of Iowa.

May 21, 1986.

Michael Noyes of Rehling, Lindburg & Gosma, Davenport, for appellant.

James P. Hoffman, Keokuk, and James Walker, Bloomington, Ill., for appellees Robert D. Adam, et al.

Thomas J. Vilsack of Bell & Vilsack, Mt. Pleasant, for appellees Ruth J. Countryman, et al.

Considered by UHLENHOPP, P.J., and McGIVERIN, LARSON, SCHULTZ, and CARTER, JJ.

LARSON, Justice.

This is another chapter in a lengthy series of litigation arising out of the failure of the Prairie Grain Company of Stockport, Iowa. *See Adam v. State*, 380 N.W.2d 716 (Iowa 1986); *Countryman v. Mt. Pleasant Bank & Trust Co.*, 357 N.W.2d 599 (Iowa 1984); *Adam v. Mt. Pleasant Bank & Trust Co.*, 355 N.W.2d 868 (Iowa 1984); *Adam v. Mount Pleasant Bank & Trust Co.*, 340 N.W.2d 251 (Iowa 1983). In the present case, the district court awarded judgment for the plaintiffs in two separate cases, consolidated for appeal, which raise identical issues. We affirm.

When Prairie Grain failed in January, 1980, these plaintiffs held claims for grain sold to it or held in storage by it. Prairie Grain was soon declared bankrupt, and these plaintiffs looked to other parties for compensation. The state of Iowa was sued on the theory its licensing and inspection of Prairie Grain had been negligently performed. *See Adam*, 380 N.W.2d at 717. Some customers, including these plaintiffs, looked to the Mount Pleasant Bank and Trust for their recovery. It is the involvement of the Mount Pleasant Bank which presents the issues on this appeal. (The Mount Pleasant Bank and Trust Company has itself become insolvent, and the Federal Deposit Insurance Corporation has assumed the receivership of it.)

The surrounding facts have been set out in our earlier opinions, and we need not repeat them in detail here. *See Adam,* 380 N.W.2d at 718; *Countryman,* 357 N.W.2d at 602–03; *Adam,* 355 N.W.2d at 869–70; *Adam,* 340 N.W.2d at 252. The theory of the present suit is that the bank, through its officers and directors, conspired with Prairie Grain to defraud the customers of Prairie Grain.

The first trial on this facet of the case resulted in a jury verdict and judgment for the plaintiffs. We reversed, however, because the court had erroneously instructed the jury that a violation of state banking laws by the defendant bank constituted a "fraudulent practice" as a matter of law. *Countryman,* 357 N.W.2d at 605–07. We remanded for a new trial. This is the appeal from that retrial.

After our remand, the parties waived a jury, and the case was tried to the court. The theory was, again, that the bank had conspired with Prairie Grain to defraud the plaintiff grain producers. The gist of the evidence was that Raymond Keller, the manager and one of the principal owners of Prairie Grain, acted in concert with the bank to give the grain company a false appearance of financial stability. Relying upon that appearance, the plaintiffs sold grain to, or stored it in, the Prairie Grain facilities. (The plaintiffs also asserted that the bank officers artificially sustained the life of Prairie Grain in order to prevent a drop in the value of their own bank stock. The district court made no finding on this allegation, and we do not consider it here.)

Keller, the principal figure in the alleged fraudulent scheme, was unavailable for trial. He had committed suicide during the Iowa Commerce Commission's investigation of Prairie Grain.

A conspiracy is established when two or more persons combine "to accomplish an unlawful end or to accomplish a lawful end by unlawful means." *Countryman,* 357 N.W.2d at 602. *See also Basic Chemicals Inc. v. Benson,* 251 N.W.2d 220, 232 (Iowa 1977). The principal element of a conspiracy is an agreement or under-standing to commit a wrong against another. "It involves some mutual mental action coupled with an intent to commit the act which results in the injury." *Id.* at 233 (citing *Neff v. World Publishing Co.,* 349 F.2d 235, 257 (8th Cir.1965)).

Because of the covert nature of a conspiracy to defraud, an express agreement can seldom be proven. A conspiracy is usually established by circumstantial evidence, and the courts are liberal in allowing proof of those circumstances. *Id.* at 606.

The culpability of Prairie Grain is not disputed. The bank conceded Prairie Grain defrauded its customers by converting stored grain and by receiving grain "purchased" by it when it was insolvent and unable to pay for it. The district court found that the bank, while it did not deal directly with the Prairie Grain customers, nevertheless had acted in concert with Prairie Grain.

Because the case was tried at law, our review is not de novo. We determine only whether the court's findings are supported by substantial evidence. Iowa R.App.P. 14(f)(1). We construe the evidence in the light most favorable to the judgment; and "this court will not weigh the evidence or pass on the credibility of witnesses." *Frantz v. Knights of Columbus,* 205 N.W.2d 705, 708 (Iowa 1973). In addition, the court's findings are broadly and liberally interpreted, and in the case of an ambiguity, they are construed to uphold rather than to defeat the judgment. *Murray v. Conrad,* 346 N.W.2d 814, 817 (Iowa 1984).

Although investigations ultimately revealed that Prairie Grain had been in serious financial trouble long before it actually folded, in 1980, that fact was not widely known. The reason, the plaintiffs contend, was that the bank pumped enough money into Prairie Grain to keep it afloat. This gave Prairie Grain a false appearance of soundness, inducing these grain producers to continue doing business with it.

The district court found the bank had violated several banking statutes. These violations will be discussed later. First, we

consider the impact of any such violations upon the claims of these plaintiffs.

The effect of the bank's alleged violations of banking statutes was at the heart of the prior appeal by the bank. We noted in that appeal that the issues were two-fold: (1) Would the bank's violations of the statutes themselves give the plaintiffs a claim for fraud; and (2) would such violations have any bearing on the elements of the common-law claim of conspiracy to defraud? *Countryman*, 357 N.W.2d at 605.

On the first question, we held that the banking statutes had not been enacted for the benefit of the grain producers, but for the benefit of depositors, shareholders and creditors of the bank. We concluded that the statutory violations did not themselves provide grounds for tort actions against the bank by Prairie Grain's customers. We noted, however, that this conclusion

> does not mean that violation of the [banking law] has no relevancy to any issue in plaintiffs' case. Plaintiffs contend that the principal owners of the bank were trying to dispose of their stock. The jury could find that through the bank's officers and employees the bank knew of Prairie Grain's precarious financial condition—receiving insufficient-funds checks; holding the books open until deposits were made; giving credit for checks on other banks before the checks were collected; lending large sums to Prairie Grain and to its manager and partial owner, Keller; giving Keller a position on the bank's board of directors and securing his subsequent resignation as director when convenience on loans so indicated; and allowing the double loan deal of $10,000 to Keller and Bontrager. In that setting, would the grant of loans to Keller and the round-about loan to Bontrager without complying with section 524.612(1), if such is the fact, be relevant as to the real relationship between Prairie Grain and the bank through Keller and Bontrager, and as to the bank's knowledge and intent?

*Countryman*, 357 N.W.2d at 606.

The district court in the present case found the bank had violated these banking statutes: Section 524.612(1) (1979), restricting a bank's loans to its directors (Raymond Keller, Prairie Grain's manager, was a director of the bank during much of the time in question); section 524.613(2), prohibiting overdrafts by a director; section 524.706(1)(a)(3), limiting certain loans to bank officers; and section 524.710(1), prohibiting officers and employees from receiving anything of value for procuring a loan.

The court also cited other acts by the bank, not covered by statute, which it concluded constituted "deviation[s] from sound banking practice and [the] bank's own policies." We will discuss those acts later.

Iowa Code section 524.612(1) provides that the total obligations of a director may not exceed twenty-percent of the capital and surplus of the bank (with certain exceptions not applicable here). In this case, the limit was $230,000. This section also requires the board of directors, voting in the absence of the borrowing director, to approve any loans to him. The court found that the bank violated both of these provisions. Iowa Code § 524.612(1). Using the month of October, 1978, as an example, the court combined the personal obligations of Keller with those of Prairie Grain. The total was $773,502.60, or $543,502.60 in excess of Keller's legal borrowing limit. Using a twenty-day period in April, 1979, as a second example, the excess was even greater.

The bank challenges these computations on several grounds. First, it claims the obligations of a separate entity such as Prairie Grain cannot be considered an obligation of the director, unless the director "owned or controlled" over fifty percent of the shares of the corporation. (Keller actually owned one-third of the shares, and his wife owned one-third.) The district court found Keller nevertheless "controlled" over fifty percent of the stock, apparently by including his wife's shares in the computation.

 The Code does not define "control." We believe control, for these pur-

poses, does not require ownership of the shares, or even the power to vote them. We believe control may be found, as the trial court did here, where a person such as Keller exercises such dominion over the corporation as to, in effect, run it as if it were his own. Keller's control of the corporation's finances is demonstrated by evidence that Keller shifted funds between Prairie Grain and himself. In fact, there was evidence that proceeds of the loans to Prairie Grain were used by Keller in the construction of his own home. When the obligations of Keller and Prairie Grain are combined, the loans far exceed the maximum legal limit of section 524.612(1).

▪ The court also found that, while the bank's board of directors had approved Keller's "clean line of credit" to $230,000, it had not approved it to the amount that it was actually extended. Thus, it had violated the second prohibition of section 524.-612(1). We believe the evidence supports this finding.

The bank argues that, even if these violations had been established, the party to be penalized would be Keller, as a bank director, not the bank itself. *See* Iowa Code § 524.1601(2)(director or officer willfully violating section 524.612(1) guilty of serious misdemeanor).

Here, however, the statute is not applied in its penal function. The bank must be charged with knowledge of what was going on, and such violations would be relevant on the question of the course of conduct taken by the bank in concert with Prairie Grain. *See Countryman*, 357 N.W.2d at 606–07.

▪ Section 524.613(2) prohibits a director from overdrawing his checking account. The court found the bank had acted improperly in allowing Prairie Grain's account to be overdrawn, at times in excess of $300,000. According to the evidence, the bank's accounting department frequently stayed open past normal banking hours in order to allow Prairie Grain to bring deposits to be applied toward the overdrafts.

The bank notes that the statute provides "[n]o *director* of a state bank shall ... [o]verdraw his deposit account in the state bank." Iowa Code § 524.613(2) (1979)(emphasis added). It is true this is not a direct prohibition against the bank. It is also true that these were the overdrafts of Prairie Grain, not Raymond Keller. Nevertheless, we agree with the district court that these overdrafts were simply another form of loan by the bank to Prairie Grain. For the reasons previously discussed, these loans were Keller's for purposes of this section.

The bank argues that overdrafts by its customers were routinely covered. This evidence is beside the point; there was no showing that other customers' overdrafts reached similar proportions; and there were no allegations, as we have here, that the bank allowed this practice in order to assist in the perpetration of a plan to defraud.

When R.J. Bontrager, the president of the bank, had a cost overrun on the remodeling of his home, he needed more money than the law permitted him to borrow from the bank. (Iowa Code § 524.706(1)(a)(3) prohibits banks from loaning to its officers any amounts in excess of $5000.) He contacted Keller, who borrowed $10,000 from the bank, then "loaned" it to Bontrager.

The court found this scheme violated section 524.706(1)(a)(3) and that Bontrager had also violated section 524.710(1), which prohibits an officer's acceptance of "anything of value" for procuring a loan. While this scheme was Bontrager's and not that of the bank, they are relevant on the question of the ongoing relationship of Prairie Grain, the bank, and their respective officers.

The district court looked to other acts by the bank which, while not violations of specific banking statutes, were nevertheless "deviations" from sound banking practices. It found that the bank and Prairie Grain exchanged possession of warehouse receipts which had been delivered to the bank by Prairie Grain as collateral for its loans. Despite the fact the loans remained

unpaid, the bank allowed the grain company to retake possession of them, presumably for state inspection purposes. The court concluded this was a "gross deviation from sound banking practice" and "strong evidence of the bank's knowledge of the grain shortage and insolvency of Prairie Grain."

Another unconventional banking practice which the court relied upon was characterized as "check kiting," perpetrated by Prairie Grain and acquiesced in by the bank. While evidence of check kiting was not strong, when it is viewed in the light most favorable to the judgment, we believe it was sufficient.

■ What is the effect of these acts by the bank? As we held in *Countryman,* they are not violations which themselves give rise to claims of fraudulent practice in an action by customers of the grain company. 357 N.W.2d at 606. Viewing the evidence in the light most favorable to the judgment, there is sufficient support for the trial court's conclusion that the bank participated in the activities of Prairie Grain which resulted in the plaintiffs' losses. The fact finder could conclude, as it did, that the customers were induced to deliver their grain to the elevator when it was actually insolvent and incapable of returning the grain or paying for it. Viewed in the light most favorable to the judgment, a conspiracy to defraud was established. Substantial evidence showed that the bank, by illegally putting money into Prairie Grain, intentionally gave it a false appearance of solvency for the bank's own benefit. We therefore affirm.

AFFIRMED.