M. Harold EZZONE, Appellant,

Patricia L. LaRosa, Intervenor–Appellant,

v.

Ronald RICCARDI a/k/a "Rick" Riccardi, Willis M. Hansen, Dennis B. Hansen, Precision of New Hampton, Inc., and State Bank of Lawler, Appellees.

Patricia LaROSA, Appellant,

v.

Ronald RICCARDI a/k/a "Rick" Riccardi, Willis M. Hansen, Dennis B. Hansen, Precision of New Hampton, Inc., and State Bank of Lawler, Appellees.

No. 93–855.

Supreme Court of Iowa.

Sept. 21, 1994.

Order Denying Rehearing and Amending Opinion Dec. 15, 1994.

Mark S. Soldat, Algona, and Mary Jane White, Waukon, for appellant M. Harold Ezzone.

Donald G. Thompson, Melissa Weets Anderson, and David E. Mullin of Bradley & Riley, P.C., Cedar Rapids, for appellant Patricia L. LaRosa.

Andrew F. Van Der Maaten of Anderson, Wilmarth & Van Der Maaten, Decorah, and Mark McCormick and Margaret C. Callahan of Belin Harris Lamson McCormick, P.C., Des Moines, for appellees.

Considered by McGIVERIN, C.J., and HARRIS, LAVORATO, NEUMAN, and TERNUS, JJ.

HARRIS, Justice.

Appeals are routinely controlled by our scope of review. This case, involving a surprising jury verdict, is a classic example. Plaintiffs, formerly husband and wife, recovered substantial verdicts following a disastrous manufacturing venture. Defendants, who consider themselves to be innocent financial backers, are convinced plaintiffs' financial wounds were either self-inflicted or caused by the employee they themselves selected. This employee, a defendant who did not attend trial, is severely chastised by all parties for his duplicity in the events leading to this dispute. The present suit [1] is largely a contest to determine who should bear the burden of loss for his misdeeds. Defendants' view, even though supported by considerable evidence, was rejected by the jury.

The jury subscribed to plaintiffs' factual contentions, contentions that clearly would have been rejected by many fact finders. Because we cannot say there is no substantial evidence supporting plaintiffs' claims, and because the case was submitted on instructions without objections by defendants' trial counsel, we affirm the findings of liability and compensatory damages. In accordance with a rule now mandated by the United States Supreme Court, we review and reduce the punitive damage awards.

Harold Ezzone and his wife Patricia LaRosa, the plaintiffs, equally owned and operated an automotive parts remanufacturing business called Precision Torque Converters of Florida, Inc. (PTCF). Ezzone founded the company based on his self-acquired knowledge of torque converter repair and his perceived demand for those services. Ezzone was gifted mechanically, but his speech impairment and cystic fibrosis are said to have hindered PTCF's expansion.

In 1983 the plaintiffs met defendant Ronald "Rick" Riccardi. Riccardi encouraged the plaintiffs to expand the business and soon thereafter assumed control of financial affairs of the company. Under his direction the business expanded, ultimately employing fifty people and operating three shifts. By now Riccardi had taken over all facets of the business and was commanding sizable compensation. Riccardi did not, however, become an owner, director, or officer, and was never given authority to sign checks.

In 1985 Riccardi and Ezzone began exploring the possibility of opening a new factory in the west or north. Defendants point out that this was because the Florida operation was floundering. Although not readily apparent at this time, the business mortgage payments from PTCF were delinquent, and the mortgage was later foreclosed. The plaintiffs provided a signed personal financial statement showing net worth of $1,479,463, but their business bank account showed an overdraft balance of $57,181. An independent audit showed a pretax income from the company of $290,000. Defendants now assert the company actually lost $8000 that year.

During 1985 Riccardi communicated with the Iowa development commission and later decided to locate in New Hampton. Because Riccardi was slow to provide detailed information, the commission delayed acting in the matter. In January of 1986, Riccardi met with New Hampton officials, including banker Robert Rigler, to whom Riccardi provided financial information. A three-bank consortium, including Rigler's, and defendant Willis

---

1. We had a preliminary view of this dispute. In *Ezzone v. Hansen,* 474 N.W.2d 548 (Iowa 1991), we held that Ezzone was not judicially estopped from proceeding with this suit by reason of his testifying, in a Florida divorce case, that he had no interest in the business.

Hansen's bank, State Bank of Lawler (cumulatively "Hansen defendants" and including defendants Dennis Hansen and Precision of New Hampton, Inc.), was to provide financial incentives if the information that had been provided proved to be accurate.

Rigler ultimately withdrew from the arrangement. He discerned problems with the financial information, and feared the New Hampton community would ultimately suffer from the venture. After Rigler withdrew, Willis visited the PTCF factory in Florida. He met with the plaintiffs and became encouraged to help them in Iowa. Willis and the defendant Bank of Lawler ultimately provided a $300,000 loan commitment to start the Iowa operation. The plaintiffs did not contribute any personal assets to the start-up, but all remaining inventory and equipment of PTCF was transferred to the Iowa factory.

Precision Torque Converters of Iowa (PTCI) was incorporated, and shares were equally distributed to LaRosa and Ezzone. All actions of the corporation required the consent of both parties. LaRosa was to return to Florida and manage PTCF, while Ezzone remained in Iowa to operate PTCI.

Upon LaRosa's return to Florida, she was beset with major financial difficulties at the company. The plaintiffs now blame this collapse on Riccardi. At the time, though, Riccardi ascribed the problems to LaRosa and convinced Ezzone to also blame her for them. PTCF was ultimately abandoned and LaRosa briefly came to Iowa. Riccardi and Ezzone promptly left on a business trip to Taiwan, leaving LaRosa alone in Iowa.

LaRosa then had to return to Florida because of arrest warrants issued for her after she signed several insufficient funds checks for PTCF. Riccardi told Ezzone that LaRosa had been unfaithful to him while in Florida. According to the plaintiffs, Riccardi then convinced Ezzone to begin hiding assets of the company and switching ownership status.

Ezzone filed for divorce in Florida and started divesting LaRosa of marital property. In this quest, Ezzone asked his attorney, Michael Kennedy, to remove LaRosa as a PTCI shareholder. Kennedy agreed to do so but did not follow through. All of these actions were said to be under the influence of Riccardi.

While Riccardi and Willis were vacationing in Florida, the PTCI factory burned to the ground. Insurance proceeds of $950,834 were paid into accounts at the bank. Although the ultimate destination of these moneys is in dispute, the factory was rebuilt.

Willis and defendant Dennis Hansen finally purchased PTCI for $250,000. The company was reincorporated as Precision of New Hampton, Inc. and, as mentioned, is one of the defendants in this suit. Although plaintiffs were not present at the closing, the Hansens accepted Riccardi's authority to transfer the property and paid the purchase price to him. Riccardi never transferred these moneys to the plaintiffs.

Ezzone initially brought suit against Riccardi, seeking an accounting. After further investigation, Ezzone added the Hansens and the bank as defendants. LaRosa later intervened.

The case was submitted on special verdicts. The jury found that Ezzone and LaRosa each owned fifty percent of PTCI and were entitled to recover on various claims we shall discuss. Damages were awarded against the defendants as follows:

1. $200,000 each to Ezzone and LaRosa against all defendants on interference with contract claims (the parties agreed that this claim is duplicative of item 3, the confidential relationship claim);

2. $125,000 each to Ezzone and LaRosa against Riccardi for his conversion of ownership (all defendants were found to have acted in concert with Riccardi) (the parties agreed that this claim is duplicative of item 3, the confidential relationship claim);

3. $325,000 for Ezzone and $350,000 for LaRosa against Riccardi for breached confidential relationship (all defendants were found to have acted in concert with Riccardi) (all parties agreed that this claim was duplicative of the conversion and interference damages, so judgment was only entered on this jury award);

4. $180,000 for Ezzone in punitive damages against Willis Hansen;

5. $25,672 for Ezzone in punitive damages against Dennis Hansen;

6. $180,000 for Ezzone in punitive damages against the State Bank of Lawler;

7. $450,000 for LaRosa in punitive damages against Willis Hansen;

8. $59,900 for LaRosa in punitive damages against Dennis Hansen;

9. $365,000 for LaRosa in punitive damages against the State Bank of Lawler.

Ezzone and LaRosa appeal from certain findings, and the Hansen defendants cross-appeal. As mentioned, Riccardi did not appear at trial; he is not involved in this appeal.

The action was tried to a jury at law, so our review is on error. Iowa R.App.P. 4. In considering the sufficiency of the evidence of a defendant's negligence, we view the evidence in the light most favorable to the plaintiff. *Miller v. Young,* 168 N.W.2d 45, 50–51 (Iowa 1969). It would be unduly cumbersome to consider the contentions in the sequence presented in the briefs, so we address them in the order we deem of controlling importance. Divisions I through X relate to issues the Hansen defendants raise in their cross-appeal. Divisions XI through XIV relate to issues raised by plaintiffs in their appeals. Other divisions relate to issues that will be explained.

I. The Hansen defendants challenge the jury's verdicts on plaintiffs' intentional interference claim on four grounds. They first assert there was insufficient evidence to support submission of the claim to the jury. It was submitted on the theory that the shares Ezzone and LaRosa held in PTCI constituted contracts and that defendants interfered with these contractual rights. The theory requires that:

One who intentionally and improperly interferes with the performance of a contract ... between another and a third person, by preventing the other from performing the contract or causing [the] performance to be *more expensive or burdensome,* is subject to liability to the other for the pecuniary loss resulting to [the other].

Restatement (Second) of Torts § 766A (1979) (emphasis added); *Nesler v. Fisher & Co.,*

452 N.W.2d 191, 194 (Iowa 1990). Defendants argue that no evidence existed from which a jury could find that performance was made *more expensive or burdensome* to Ezzone or LaRosa. This tort was presented to the jury as follows:

Ronald Riccardi, Willis M. Hansen, Dennis B. Hansen, the State Bank of Lawler and/or Precision of New Hampton, Inc. intentionally and improperly interfered with the contract by treating Ronald Riccardi as the only shareholder, director and officer of Precision Torque Converters of Iowa, Inc.

The defendants' trial counsel (they retained a different counsel on appeal) did not object to submission of this instruction. It therefore became the law of the case. *Tarrell v. Erdmann,* 221 N.W.2d 504, 507 (Iowa 1974). Hence we are bound by the instruction and not prior case law in our analysis. The question thus becomes whether sufficient evidence supported the jury's finding that defendants intentionally and improperly interfered with Ezzone's and LaRosa's contracts as shareholders in PTCI, without requiring a showing of more expense or burden.

Ezzone asserted the Hansen defendants interfered with his stockholding contract by dealing with Riccardi as if he were the only shareholder, director and officer of the corporation. He claims this interference prevented him from exercising his rights and powers under the contract.

Viewing the record in a light most favorable to Ezzone, it can be said the Lawler bank and the Hansen defendants relinquished complete control of all PTCI funds within their possession to Riccardi personally. This occurred in April 1987 when they created a $100,000 certificate of deposit in Riccardi's name and wired $150,000 in PTCI investment account and sale proceeds to Riccardi in Florida. In June of 1987, the bank unilaterally closed all PTCI accounts, despite Ezzone's protest, and gave remaining account funds to Riccardi. Evidence also showed that the bank gave Riccardi access to the PTCI investment account, which neither Ezzone nor LaRosa had authorized.

According to defendants' evidence, of course, all this was allowed to happen because the bank was led to believe Riccardi was given Ezzone's and LaRosa's consent to control the business. But, according to plaintiffs' evidence, it happened because the bank was operating in concert with Riccardi to remove Ezzone and LaRosa from the operational picture. The bank's alleged motive was the purchase of PTCI at a discount price. While strong evidence clearly supported the first picture, sufficient evidence also supported the latter, more sinister view. Willis worked very closely with Riccardi throughout 1985 and 1986 and should have learned the nature of Riccardi's interest. The record supports a conclusion that he knew Ezzone and LaRosa were the sole owners of PTCI and that he knew Riccardi had no actual authorization to handle money personally or to sell PTCI's assets. Willis should have known better than to purchase PTCI's assets solely on the basis of Riccardi's authority.

We conclude that sufficient evidence supported the jury's finding that the bank and associated defendants interfered with Ezzone's rights as a shareholder in PTCI.

■ The defendants add a special abandonment argument against LaRosa. In addition to arguments made against Ezzone's claims, they contend LaRosa abandoned PTCI after attending and participating in the 1986 closing. After that point, they say, she took no action with respect to her ownership interest.

We however find this argument unpersuasive. LaRosa was made a fifty percent shareholder of PTCI upon its incorporation. She contends her ownership never ended, that she never sold, transferred her shares, or relinquished them in any way. Defen-

dants note that she failed to list her stock as an asset in her divorce from Ezzone. Even given this apparent admission, the jury could have viewed this as an oversight and decided she retained ownership. The answer to the special argument against LaRosa is that mere inaction, when no action is called for, does not equal abandonment. There is sufficient record to support the jury's verdict with respect to LaRosa's claim.

■ II. Ezzone and LaRosa sought damages for the decline in value of their PTCI shares caused by defendants' acts. Defendants argue that this claim was available only to PTCI, not its shareholders.

"As a general rule, wrongs which affect the corporation itself, or the stockholders generally, give rise to causes of action on the part of the corporation, and not primarily on the part of an individual shareholder." 19 Am. Jur.2d *Corporations* § 2246, at 148 (1986). Further, it has been noted that:

> The fact that a stockholder suffers indirect harm, such as a diminution in the value of corporate shares resulting from the impairment of corporate assets, due to a wrong done the corporation by a third party, does not give the stockholder an individual right of action since such an action would authorize multitudinous litigation and ignore the corporate entity.

*Id.* at 149.[2]

■ Plaintiffs argue that theirs is a direct, not a derivative, action against the defendants. A stockholder may sue when he or she has sustained a loss *separate and distinct* from that of other stockholders generally. *Id.* § 2245, at 147.

A stockholder may sue as an individual where the act complained of creates not

---

**2.** We pass considering an exception to this general rule. It arises when corporations are closely held by a small number of individuals and operated more as a partnership than a corporation. It may then be proper to bring an action in the names of individual owners, though technically the cause of action may rest with the corporation.

Derivative suits on behalf of Iowa corporations are governed by Iowa Code § 490.740 (1993). Under that provision, certain procedures must first be followed before a shareholder is allowed

to bring suit for a wrong done the corporation. Among other things, the shareholders must first demand that the corporation take action. Such demands must be supported with appropriate affidavits. Iowa R.Civ.P. 44. In this case, however, the demand would be made by the shareholders to themselves, as they were also the officers of the corporation. We have held that, when such demands are futile, the shareholder need not make them. *Holi–Rest, Inc. v. Treloar,* 217 N.W.2d 517, 523 (Iowa 1974). Here, the requests might well have been unnecessary.

only a cause of action in favor of the corporation but also creates a cause of action in favor of the stockholder as an individual, such as where the act is in violation of duties arising from contract or otherwise....

13A William M. Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 5921, at 519 (rev. ed. 1954); *see Cunningham v. Kartridg Pak Co.*, 332 N.W.2d 881, 883 (Iowa 1983). Such an injury must be separate and distinct to the suing shareholder and not generally injuring all shareholders. *Id.*

Alternatively, when there exists a special duty to the shareholder, outside of duties to the corporation, breach of that duty individually harms the shareholder and suit may be brought in that capacity. *Id.* To this end, plaintiffs argue the interference with contract was specifically directed at them, not the corporation. Because of this, they claim to possess their own action.

We agree. The defendants are said to have specifically directed their efforts at Ezzone and LaRosa in an attempt to separate them from their ownership interests in the corporation. We think a personal right of action is alleged.

■ Plaintiffs' right is even more strongly supported on an alternative ground. They note that PTCI ceased to exist in November 1987 when Iowa's secretary of state terminated the corporation pursuant to Iowa Code section 496A.130 (1987) (now Iowa Code section 490.1420 (1993)). Plaintiffs argue they possess any right of action previously held by the corporation.

The cancellation of a corporation does not destroy remedies available to the corporation. Iowa Code § 496A.130 (1987) (fifth unnumbered paragraph) (since repealed; *see* Iowa Code § 490.1405(2)(e) (1993)). Upon issuance of the certificate of cancellation, the entity was to be liquidated as provided by chapter 496A for dissolutions generally. Under these liquidation provisions, the shareholders had the "power to take such corporate or other action as shall be appropriate to protect such remedy, right or claim." Iowa Code § 496A.102 (1983) (*see now* Iowa Code

§§ 490.1406 and .1407 (1993)). Most importantly, under no circumstances could a canceled corporation prosecute an action in its own name prior to reinstatement. Under former chapter 496A, therefore, the shareholders of a canceled corporation were empowered to bring suit on the entity's behalf, but in their name individually, while the corporation was stripped of that right.

■ III. The jury awarded Ezzone and LaRosa $200,000 each against the defendants on the interference claim. Defendants argue insufficient evidence supported this amount. They argue the most diverted by Riccardi was $250,000 and that the maximum per share recovery is $125,000.

Plaintiffs however note that an additional $500,000 was drained from PTCI bank accounts after January of 1987. We agree that the jury could have concluded that this money was siphoned off wrongfully and added some or all of it to damages. The plaintiffs were also entitled to recover this fund on the canceled corporation theory.

■ IV. Defendants argue that acts of other parties (specifically Riccardi) were the intervening causes of any of plaintiffs' damages or injuries. The trial court's refusal to instruct on this defense is the subject of another assignment. This defense provides that, when an intervening act of a third person is intentionally tortious, or criminal, and when the harm is not within the scope of the risk created by the actor's conduct, responsibility for the consequences of that act may be shifted to that third person. Restatement (Second) of Torts § 442B, at 469 (1965).

We find no error in the refusal to give the requested instruction. "[R]ules that restrict the actor's responsibility under theories of superseding cause are for the court to apply rather than the jury." *State v. Murray*, 512 N.W.2d 547, 550 (Iowa 1994) (citing Restatement (Second) of Torts § 453). We do not suggest that the superseding cause doctrine is appropriate here in any event. We have grave doubts whether an *intentional* tort can be superseded by another intentional tort, and we do not decide whether Riccardi's acts

were without the scope of the risk created by the other defendants.

■ V. Defendants argue the district court erred in overruling their objection to instruction 21 which defines the nature of the plaintiffs' contract with the corporation, or the rights they held as shareholders.[3] Defendants objected on the ground that the instruction failed to say that agents, as well as directors, could exercise corporate powers. This argument was apparently based on the defense theory that Riccardi was an agent of the plaintiffs and therefore acted under their authority. Because of this, his acts could not have been wrongful to them and, by implication, the defendants would not be acting in concert to a wrongful act.

Defendants concede that they withdrew their agency claim but insist they continued to assert Riccardi had actual or apparent authority to act for PTCI. We think that in giving up their agency defense defendants waived all its elements, including the authority question. The assignment is without merit.

■ VI. Finally defendants attack the trial court's use of instruction 24, listing the factors to be considered in evaluating the reasonableness of the interfering conduct.[4] Defendants' challenge to this instruction, as we read it, contends that it is insufficient to include "all evidence on the issue of propriety of defendants' conduct." Because we do not read the instruction as so limiting, we find the assignment also without merit.

VII. Other assignments challenge submission of plaintiffs' conversion and confidential relationship claims. With regard to conversion, defendants argue that Riccardi's acts did not, as of the date specified by the jury, constitute conversion of plaintiffs' assets.

■ Conversion is the act of wrongful control or dominion over another's personal property in denial of or inconsistent with that person's possessory right to the property. *Kendall/Hunt Publishing Co. v. Rowe,* 424 N.W.2d 235, 247 (Iowa 1988); Restatement (Second) of Torts § 222A(1), at 431 (1965). The jury found by a special verdict that conversion by Riccardi occurred on January 30, 1987. Defendants note that, on that date, Riccardi endorsed a check and deposited it into a PTCI account. Because the money went to PTCI and not to Riccardi, defendants argue no conversion occurred.

But plaintiffs' property rights in PTCI consisted of their ownership and legal rights to possess, transfer or dispose of their interest in PTCI. *See State v. Cowen,* 231 Iowa 1117, 1123, 3 N.W.2d 176, 180 (1942). Their theory was that Riccardi, over time, gradually took bits and pieces of corporate control away from the plaintiffs, but in fact was "setting them up" to convert all of their ownership

---

**3.** Instruction 21 reads as follows:

A contract exists between a corporation and its shareholders. Under this contract, the shareholders have the right to choose the corporation's board of directors.

All corporate powers are exercised by or under the authority of, and the business and affairs of a corporation are managed under the direction of, the corporation's board of directors. These powers include the powers to:
 (a) make and alter bylaws;
 (b) issue the shares stated in the corporation's articles of incorporation;
 (c) purchase, take, receive, lease, or otherwise deal in and with, real or personal property, or any interest therein, wherever situated;
 (d) to sell, convey, mortgage, pledge, lease, exchange, transfer, or otherwise dispose of all or any part of the corporation's property and assets;
 (e) make contracts;

 (f) elect or appoint officers and agents of the corporation, and define their duties and fix their compensation.

**4.** Instruction 24 provided:
 In determining whether a person's conduct in intentionally interfering with a contract is improper, you should determine whether the conduct was fair and reasonable under the circumstances. In determining whether the conduct was improper you may consider:
 1. The nature of the conduct.
 2. The person's motives.
 3. The interests of the party with which the conduct interferes.
 4. The interest sought to be advanced by the person.
 5. The social interests in protecting the freedom of action by the person and the contractual interests of the other party.
 6. The nearness or remoteness of the person's conduct to the interference.
 7. The relations between the parties.

interest to his control. We think a jury case on the conversion claim was presented.

The claim was presented by other evidence of false (and back-dated) organizational meeting minutes in which Riccardi purported to make himself sole shareholder, director and president of PTCI. Although it is claimed Ezzone was present at this meeting, he did not sign the minutes. The decision was made by the board of directors, but LaRosa, who was also on that board, did not attend the meeting.

At the sale of PTCI to Hansen, he accepted these organizational minutes as proof that Riccardi was sole owner and had authority to sell. He accepted them knowing Riccardi was in Florida on the date the papers were allegedly signed in New Hampton. Willis was present for the actual organizational meeting several months earlier in which Ezzone and LaRosa signed the minutes, but he was not troubled by the lack of their signatures on these minutes. Finally, he was presented with no transfer documents at all.

It was at this closing that Hansens paid $250,000 to PTCI in exchange for its assets. As mentioned, instead of depositing this amount in PTCI accounts, $150,000 was wired to Riccardi's personal account in Florida and a $100,000 certificate of deposit was created in Riccardi's name. None of these proceeds were ever advanced to the plaintiffs. This final sale was, under the plaintiffs' theory, the culmination of a lengthy process by which Riccardi gained control over the plaintiffs' interests.

Evidence tied the Hansen defendants to Riccardi's conduct. Plaintiffs point to Hansen's alleged elimination of two other consortium banks in the initial PTCI financing scheme. Similar "clearing of the field" occurred with respect to insurance providers. It is claimed that this caused forfeiture of certain state economic development grants. Plaintiffs also argue that the Hansen defendants' acts constituted criminal theft when they aided in Riccardi's scheme to convert ownership of PTCI. At the least, defendants were unable to convincingly explain their alleged ignorance of LaRosa's fifty percent ownership interest when they purchased PTCI's assets.

The jury could also have concluded from the record, depending on whom they deemed more credible, that Willis perjured himself on the stand. While Willis claimed no knowledge of any Riccardi "subterfuge" against LaRosa, attorney Michael Cross testified that Willis had told him the opposite. (Cross had been hired by Ezzone to investigate Riccardi's business dealings prior to this litigation.)

 In defending against the confidential relationship claim, defendants focus on the wrongful behavior of the plaintiffs, especially that of Ezzone. Defendants note that the confidential relationship doctrine is based on the need for protection of an innocent, subservient person who relies in a transaction on the skill and integrity of a dominant person. *See Oehler v. Hoffman,* 253 Iowa 631, 635, 113 N.W.2d 254, 256 (1962); *Klatt v. Akers,* 232 Iowa 1312, 1319, 5 N.W.2d 605, 609 (1942). They argue, not without some evidence, that Riccardi's betrayal occurred in the course of a mutual, fraudulent scheme with Ezzone to cheat LaRosa. It is true that, for example, Ezzone lied about his ownership interest in PTCI in divorce proceedings. He lied about ownership of other assets and sources of income as well.

The jury was entitled to accept Ezzone's explanation for his deceit. Under plaintiffs' theory, Riccardi manipulated Ezzone and LaRosa into a position in which severe marital stress occurred. His scheme required separation of the plaintiffs from their assets. Half of this goal was achieved when the Florida divorce court denied LaRosa any interest in PTCI. Under this theory, Riccardi's dominance over the affairs was only achieved through the trust given him by the plaintiffs. When he ultimately, under the plaintiffs' theory, used this trust to convert their assets, a breach occurred. The jury could have seen the evidence as supporting this theory. Again, the jury could also have found the Hansen defendants acted in concert in this breach of trust. The record supports the jury's finding of concert action.

VIII. Under plaintiffs' theory, Riccardi was the direct perpetrator of all torts alleged. The Hansen defendants became lia-

ble because they allegedly acted in concert with Riccardi to further his bad acts.

Under the Restatement, a person becomes subject to liability for harm caused by the tortious conduct of another when that person: (a) does a tortious act in concert with the other or pursuant to a common design with the other (traditional conspiracy); or (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other in such conduct (aiding and abetting). Restatement (Second) of Torts § 876, at 315 (1979); *see Tubbs v. United Cent. Bank, N.A.,* 451 N.W.2d 177, 182 (Iowa 1990).

For conspiracy, an agreement must exist between the two persons to commit a wrong against another. The agreement must involve some mutual mental action coupled with an intent to commit the act that causes injury. *See Adam v. Mt. Pleasant Bank & Trust Co.,* 387 N.W.2d 771, 773 (Iowa 1986). Speculation, relationship, or association and companionship do not establish a conspiracy. *American Sec. Benevolent Ass'n, Inc. v. District Court,* 259 Iowa 983, 996, 147 N.W.2d 55, 63 (1966). As to aiding and abetting, there must be a wrong to the primary party, knowledge of the wrong on the part of the aider, and substantial assistance by the aider in the achievement of the primary violation. *Tubbs,* 451 N.W.2d at 182.

Defendants argue that plaintiffs' claim imposed a duty on them to monitor the internal affairs of PTCI, a duty they were not required to assume. They also argue there was no evidence of any conspiracy to divert corporate assets. We think the evidence, in the light most favorable to the plaintiffs, supports the finding of concert action by the Hansen defendants. Willis set up Riccardi's personal accounts, allegedly used to siphon off PTCI funds. Willis acknowledged Riccardi as PTCI president when he endorsed a $100,000 insurance check. Willis treated Riccardi as having authority to sell the corporation when he at least should have known there were problems with his asserted ownership. Willis acknowledged Riccardi's fraudulent ownership when he directed the sale proceeds to Riccardi's personal accounts.

The jury could also have found Dennis acted in concert with Riccardi. Plaintiffs' evidence indicated Dennis Hansen aided Riccardi in the scheme to hide assets from LaRosa. We think the jury's finding of concert action is supported by sufficient evidence.

IX. Punitive damages can be awarded if the jury finds "the conduct . . . from which the claim arose constituted willful and wanton disregard for the rights or safety of another." Iowa Code § 668A.1(1)(a). The intentional acts of the defendant must be of "an unreasonable character in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow. . . ." *Fell v. Kewanee Farm Equip. Co.,* 457 N.W.2d 911, 919 (Iowa 1990). The Hansen defendants contend that such a finding is unsupported by the record. They specially note Ezzone's own bad acts in hiding assets from LaRosa and argue this should counter any alleged bad acts of their own.

In common with most jurisdictions, we have considerable case law carefully explaining the nature and purpose of punitive damages. *See, e.g., Beeman v. Manville Corp. Asbestos Disease Compensation Fund,* 496 N.W.2d 247, 255–56 (Iowa 1993); *Ryan v. Arneson,* 422 N.W.2d 491, 495–96 (Iowa 1988). The cases make it clear that punitive damages are awarded, not because a plaintiff deserves them, but as punishment, to deter the defendant and others from repeating similar outrageous conduct. In the light of this purpose, and accepting, as we must, plaintiffs' version of the evidence, we cannot say an award of punitive damages was inappropriate.

Through recent years we have become increasingly willing to set aside a punitive damage award, finding the defendants' conduct insufficiently egregious to support it. *Coster v. Crookham,* 468 N.W.2d 802, 810–11 (Iowa 1991). But we have persisted, until now, in a resolute unwillingness to grant remittiturs in damage awards. *Team Cent., Inc. v. Teamco, Inc.,* 271 N.W.2d 914 (Iowa 1978).

We note, however, that we are now obliged as a matter of constitutional law to assume responsibility for reviewing the appropriate-

ness of the size of punitive damage awards. Since our decision in *Spaur v. Owens-Corning Fiberglas Corp.*, 510 N.W.2d 854 (Iowa 1994), the United States Supreme Court has decided it is a denial of due process for a state to allow punitive damages without according appellate review of the appropriateness of the amount. *Honda Motor Co. v. Oberg*, — U.S. —, —–—, 114 S.Ct. 2331, 2338–41, 129 L.Ed.2d 336, 346–51 (1994). Although no constitutional question is presented here, we take the *Oberg* holding as a signal to order remittitur if appropriate.

 This and future reviews will be conducted on the basis of principles previously announced in punitive damages cases. Awards will be tested with a view of the extent and nature of the outrageous conduct, the amount necessary for future deterrence, and with deference to the relationship between the punitive award and plaintiff's injury, as reflected in any award for compensatory damages. In addition to these traditional factors, we shall consider all circumstances surrounding the conduct and relationship between the parties. Any provocation of the conduct by plaintiff will be a factor. *See* Restatement (Second) of Torts § 908 cmt. e (1979). We take the provocation to include participation in the conduct complained of.

Upon our mandated review, we consider the punitive award here to be greatly excessive. Although Ezzone convinced the jury he was manipulated by Riccardi into undertaking his deceitful conduct, we think the record clear, for punitive damages purposes, that his participation was provoking as well as provoked. We think that punitive damages awarded him are out of proportion to any amount needed, in addition to compensatory awards, for deterrence purposes. Ezzone's punitive damages should be no more than the following amounts:

$18,000 against Willis Hansen

$2500 against Dennis Hansen

$1000 against the State Bank of Lawler

LaRosa's conduct was not subject to the same criticism as Ezzone's, but the record does clearly show she backed Ezzone's misrepresentations about the business to the Hansen defendants. In addition we think the punitive damages awarded to her, as was the case with Ezzone's, are out of proportion to any amount needed for deterrence purposes. LaRosa's punitive damages should be no more than the following amounts:

$90,000 against Willis Hansen

$6000 against Dennis Hansen

$1000 against the State Bank of Lawler

Upon remand the district court shall order a new trial as to either plaintiff who fails to file a remittitur accepting the amounts mentioned.

 X. Turning to Ezzone's and LaRosa's appeals, they first complain of the trial court's refusal to allow adding LaRosa as a new plaintiff. Ezzone was first to sue and later moved for leave to amend and add LaRosa as a new plaintiff. The motion was denied. Because of this denial, LaRosa filed her own action against the defendants and petitioned to intervene in Ezzone's action. Her action was ultimately consolidated with Ezzone's for trial. Ezzone and LaRosa now seek reversal of the court's earlier denial. They seek this because LaRosa is said to have lost interest on her judgments. As now ordered, interest on LaRosa's judgment runs from the time she filed her companion case. But if the trial court's denial were to be reversed, interest would run from Ezzone's filing, almost three years previously.

Rulings to amend are normally discretionary. *Atlantic Veneer Corp. v. Sears*, 232 N.W.2d 499, 503 (Iowa 1975). But the trial court's ruling here was based on a misapprehension of the law. The trial court stated the motion was denied because "[Iowa rules of civil procedure] 88 and 89 are not intended for adding new plaintiffs." Iowa rule of civil procedure 89 authorizes amendments to add parties where the amendment relates back to the date of the original pleading. This rule speaks of amendments "changing the party against whom a claim is asserted...." It is true that, on its face, this rule appears to involve only defendants. *M–Z Enters., Inc. v. Hawkeye–Security Ins. Co.*, 318 N.W.2d 408, 411 (Iowa 1982). We have held, however, that the rule also allows amendments that add plaintiffs. *Id.* The only requirement is that the named defendants have received sufficient notice of the action during the stat-

ute of limitations period. *Id.* Defendants do not assert any lack of notice.

Because the trial court's refusal to grant leave to amend was based on an erroneous legal assumption, it must be reversed. It does not however follow that leave should be granted. On remand the trial court should exercise its discretion on the motion. Only if it grants leave should it allow interest on the judgment as amended.[5]

XI. Ezzone first filed his action against Riccardi on April 11, 1988, and sought monetary damages for wrongful conversion. This action was amended on April 22 to include the Hansen defendants and to seek declaratory judgment concerning ownership of PTCI. The amendment did not seek any monetary damages against the Hansen defendants. It was later, on March 17, 1989, that Ezzone moved for leave to amend so as to extend all monetary claims, previously asserted against Riccardi alone, to include the Hansen defendants. It was this amendment that alleged the concert of action claims. The motion was granted and the amended petition was filed on May 8, 1989.

The court awarded postcommencement interest on the $325,000 award for breach of confidential relationship from May 8, 1989, the date that claim was added to the suit. This award was pursuant to Iowa Code section 535.3 which allows interest to "accrue from the date of the commencement of the action." The action for monetary damages was thought to have been "commenced" when that cause was added, not at the inception of the suit, so the trial court only awarded interest to that date.

When monetary damages arise from distinct new claims made in an amended petition, we allow interest on the judgment only from the date plaintiff filed its amended petition. *Beeck v. Aquaslide 'n' Dive Corp.,* 350 N.W.2d 149, 169 (Iowa 1984); *Coachmen Indus., Inc. v. Security Trust & Sav. Bank of Shenandoah,* 329 N.W.2d 648, 651 (Iowa 1983). *See also Happy Chef Systems, Inc. v. John Hancock Mut. Life Ins. Co.,* 933 F.2d 1433, 1437 (8th Cir.1991) (citing the interpretation of *Beeck* and *Coachmen* ). Although plaintiffs challenge our prior holdings, we believe they are correct and decline to overrule them.

We are satisfied that the claim for breach of confidential relationship first arose in the May 8, 1989 amendment. We affirm the trial court determination that interest accrued only from this date. The ruling applies as well to interest on LaRosa's $350,000 judgment.[6] We note we are unpersuaded by plaintiffs' contention that the beginning date should be May 1, 1989 (date of court approval), rather than May 8 (date of filing).

XII. All parties agreed that the $325,000 Ezzone verdict for breach of confidential relationship duplicated the $200,000 verdict for interference and the $125,000 verdict for conversion. But plaintiffs assert that some portion of the $325,000 verdict was liquidated prior to the commencement of the action and therefore should include precommencement interest. The district court limited the recovery to postcommencement interest.

Iowa Code section 535.2(1)(b) allows interest to accrue on money after it becomes due. Section 535.2(1)(d) provides for interest on money "received to the use of another and retained beyond a reasonable time, without the owner's consent, express or implied."

---

5. If on remand the trial court denies LaRosa the right to be added as a plaintiff, an alternative interest argument must be considered. LaRosa points out that we have held an intervenor does not need to abide by the statutes of limitations where the suit was filed within the applicable time period. *Kintzel v. Wheatland Mut. Ins. Ass'n,* 203 N.W.2d 799, 806–07 (Iowa 1973) (citing *Stevens v. Citizens Ins. Co.,* 69 Iowa 658, 664–65, 29 N.W. 769, 771–72 (1886)). LaRosa argues by analogy that her suit, as intervenor, relates back to the filing of Ezzone's suit and therefore interest should also accrue from that date.

We find that postcommencement interest is a far different matter from statutes of limitations, and reject the analogy as binding. If the order on remand is to grant the motion to add LaRosa as plaintiff, interest on her award will be allowed from the date of the filing of the motion.

6. LaRosa was not a party to the action on May 8, 1989. The beginning date for accumulation of interest on her award will be affected by the trial court ruling on remand, previously mentioned, regarding the application that she be added as a party.

We subscribe to the general rule that interest runs from the time money becomes due and payable. *Vasquez v. LeMars Mut. Ins. Co.*, 477 N.W.2d 404, 406 (Iowa 1991). Interest generally will not run until the claim is liquidated, or is certain and known. *Id.* at 407. We recognize an exception "in cases in which the entire damage for which recovery is demanded was complete at a definite time before the action was begun." *Id.*[7]

Plaintiffs argue that the conversion claim became liquidated on January 30, 1987, the date the jury found Riccardi converted ownership and control to himself. Because the conversion claim was duplicated and subsumed in the breach of confidence recovery, the district court denied precommencement interest. We think the ruling was correct under our holding in *Vasquez*, 477 N.W.2d at 407.

Ezzone looks back to alternative dates on which he can argue his damages were complete. This approach would allow precommencement interest in nearly every case on the basis of postverdict hindsight. The "entire damages complete" exception does not apply where there is a dispute concerning when the damages became complete. *See Mrowka v. Crouse Cartage Co.*, 296 N.W.2d 782, 784–85 (Iowa 1980). The trial court was correct in refusing to award precommencement interest.

XIII. After trial, plaintiffs requested certain costs be assessed to the defendants. They also asked that costs draw interest pursuant to Iowa Code section 535.3. The trial court awarded costs, but failed to mention interest. We have said that "money due on a judgment for costs is as much money due on a judgment as is money due on a judgment for damages, and this is true whether such costs embrace the fees of witnesses or officers or attorney's fees." *Arnold v. Arnold*, 258 Iowa 850, 856, 140 N.W.2d 874, 877–78 (1966). The trial court should have awarded interest.

The question remains as to when the interest should begin its accrual. Under Iowa Code section 535.3, interest accrues from the commencement of the action. We have held, however, that section 535.3 does not allow interest on expenses to accrue from commencement if the applicable transactions did not occur until after litigation had begun. *Rowen v. LeMars Mut. Ins. Co.*, 347 N.W.2d 630, 641 (Iowa 1984). Plaintiffs argue that interest should accrue on an individual expenditure basis, item by item. We reject this contention as wholly impractical. Such a rule would be impossible in its complexity. For costs accrued after commencement of the action, interest is to be allowed only from judgment.

XIV. Issue is joined on the trial court's reduction of a *pro tanto* credit. Plaintiffs' damage awards were reduced by the amount they received in the settlement with attorney Michael Kennedy. There are two issues under this division. First, Ezzone and LaRosa claim that the Hansen defendants should have been denied this *pro tanto* credit because they failed to affirmatively plead and prove a right to it. Second, the Hansen defendants claim the award against Riccardi should not have been credited, and the credit should apply entirely to plaintiffs' recovery against them.

Under the *pro tanto* credit rule, we "allow a dollar-for-dollar credit against a plaintiff's personal injury verdict for sums received in settlement from other tortfeasors." *Knauss v. City of Des Moines*, 357 N.W.2d 573, 578 (Iowa 1984). "All payments in settlement of a claim, except payments in the nature of a gratuity or arising from separate contract, fall under this rule which is designed to prevent the unjust enrichment of a double recovery." *Id.* The burden is on the party seeking to reduce its liability by the settlement amount and must be pleaded as an affirmative defense. *Id.* This party must show that "without such a credit the plaintiff would receive more than full compensation for his [or her] injuries...." *Id.*

The effect of our *pro tanto* credit rule has been circumscribed in comparative fault claims under Iowa Code sections 668.3 and

---

7. Of course this analysis does not apply in cases considering postcommencement interest. Iowa Code § 535.3 allows interest to accrue from date of filing regardless of whether it only became due at time of judgment. *Vasquez*, 477 N.W.2d at 406–07.

668.7. *Thomas v. Solberg*, 442 N.W.2d 73, 77 (Iowa 1989). This however is not such a case and the traditional *pro tanto* credit rule applies. *See Freeman v. Ernst & Young*, 516 N.W.2d 835, 838–39 (Iowa 1994).

■ The plaintiffs note that, following Kennedy's settlement, the Hansen defendants never amended their answer to plead entitlement to the *pro tanto* credit. The Hansen defendants offered no evidence to support it. The trial court made no findings of fact on the issue, but did ultimately award the credit to all Hansen defendants and defendant Riccardi. So plaintiffs now urge that no *pro tanto* credit claim is presented.

Defendants requested the *pro tanto* credit, not in a regular pleading, but in a memorandum filed with the court. In responding, plaintiffs did not protest in any way that the memorandum was inadequate as a pleading, or that it failed to call for a hearing on the matter. Plaintiffs' resistance urged only that the *pro tanto* credit should not apply to the punitive damage awards. On appeal, though, plaintiffs attack the *pro tanto* credit on a much broader basis: the lack of a pleading, hearing and evidential showing of entitlement under *Knauss.*

Under ordinary circumstances plaintiffs' position would be sound. Parties urging an affirmative defense cannot rely on opposing parties to alert them of their burden to plead and prove it. But plaintiffs' resistance here was misleading; it urged a partial resistance in which they omitted the position they now urge. Under these special circumstances, we hold that defendants' memorandum asking for *pro tanto* credit was adequate for its application.

■ The plaintiffs next attack the application of the *pro tanto* credit to the punitive damage award. This issue was preserved and appears to be a question of first impression in Iowa. Plaintiffs note the rationale for the *pro tanto* credit rule, which seeks to avoid compensation in excess of actual damage. Of course punitive damages have nothing to do with compensation. There is some force to this argument. We think that, normally, no one should be allowed to escape liability for punitive (as contrasted with compensatory) damages on the fortuitous basis of a *pro tanto* credit. But we need not decide the question here because at no time did the credit exceed the compensatory damages. This can be shown by referring to the following compilation of the district court in fixing the credits:

| Defendant | Joint & Several Liability | Individual Share | Credit |
| --- | --- | --- | --- |
| Riccardi | $675,000 | $145,000 | $64,811.25 |
| Willis H. | 675,000 | 135,000 | 9,633.75 |
| Dennis H. | 675,000 | 135,000 | 2,791.25 |
| Bank | 675,000 | 135,000 | 8,566.25 |
| Precision | 675,000 | 135,000 | 1,697.50 |

Even if it applies as plaintiffs request, it leaves the ultimate award unaffected. There was no reversible error in awarding a *pro tanto* credit because of any effect on the punitive damage award.

■ XV. The district court entered judgment on the compensatory damages against all defendants jointly and severally. After subtracting the *pro tanto* credit, the court set out individual judgment amounts and did not clarify whether they would operate jointly and severally.

The jury awarded $325,000 and $350,000 in compensatory damages to Ezzone and LaRosa respectively. These were entered jointly and severally against all five defendants. In assigning the *pro tanto* credit, the court added these awards together, then divided that amount by five, arriving at $135,000 per defendant. The court then added the applicable punitive damage award, and any individual liability, to each share. From this, the court weighed each share and arrived at a percentage amount. Each defendant received this percentage share of the *pro tanto* credit created by the Kennedy settlement.

Confusion arose when the court entered judgment, but only stated the amount owed per litigant. This made it appear as if each defendant were individually liable, but not jointly and severally. Instead the court should have subtracted the overall *pro tanto* credit of $87,500 from the overall judgment of $675,000, leaving $587,500. This represents a 12.77¢ credit on each dollar of judgment.

Ezzone was awarded a $325,000 judgment against all defendants. The credit is 12.77¢ on the the dollar, or $41,502.50. This leaves

a joint and several judgment of $283,497.50. Ezzone was also awarded $5000 against Riccardi individually that should be credited $638.50, leaving a judgment of $4316.50.[8]

LaRosa was awarded a $350,000 judgment against all defendants. The credit is 12.77¢ on the dollar, or $44,695. This leaves a judgment of $305,305. LaRosa was also awarded $5000 against Riccardi individually and should be credited $638.50, leaving a judgment of $4316.50.

■ Although the trial court factored punitive damages in assessing the *pro tanto* credit among the defendants, we have noted punitive damages are not allowed as compensation. We hold they should be omitted as a factor in allowing *pro tanto* credits.

Tax costs twenty-five percent to Ezzone, twenty-five percent to LaRosa, and fifty percent to the Hansen defendants. The case is remanded for entry of judgment in conformance with this opinion.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**

## ORDER DENYING REHEARING AND AMENDING OPINION

■ Each of the parties has filed a petition for rehearing. These petitions, together with briefs in support of and resistance to them, have been considered en banc by the court.

The petitions have presented a large number of issues, all of which have been carefully considered. Two merit special mention. Both concern a question of preservation of error.

Defendants-appellees challenge the court's holding that their challenge to plaintiffs' theory of liability was lost when explained in a jury instruction. This court's opinion found there was no objection to the instruction, a finding defendants vigorously challenge. Defendants correctly note they did object to the instruction. The flaw in the present challenge is in the nature of that objection. It did not assail plaintiffs' legal theory (the point raised on appeal). The objection was

confined to two things: (1) there was insufficient evidence to submit interference claim; and (2) plaintiffs were not real parties in interest.

Like many disputes in this complex litigation, this one is not entirely free from doubt because plaintiffs did assail the theory at other points during the trial. But we continue to think the instruction became the law of the case, and do not think our persistence is hypertechnical.

The second point we specially note has to do with plaintiffs' challenge to the reduction in the punitive damage award, a challenge we do think is hypertechnical. Plaintiffs contend error was not preserved for this reduction when not spelled out in the assignment of error in which defendants challenge punitive damages.

Whatever deficiency plaintiffs allege in the scope of defendants' assignment challenging the punitive damage award, they cannot suggest we introduced the matter into the dispute. Defendants complained of the sufficiency of evidence of punitive damage at every stage of the trial, and challenged the award in a motion for judgment notwithstanding the verdict and for a new trial.

Defendants' complaint could be answered easily if we, as we have in the past, claimed inherent authority to order remittiturs. *See Castner v. Wright*, 256 Iowa 638, 659, 128 N.W.2d 885, 886 (1964) (supplemental opinion). The claim of our inherent authority dates from the earliest days of our court. *See Gower v. Carter*, 3 Iowa 243, 256 (1856). We would claim this inherent authority only in rare situations and with reluctance. We need not rely on inherent authority here because of a special rule that in some situations intermingles concepts of excessiveness and appropriateness.

Prior to our decision in this appeal, because we heretofore refused to review punitive damage awards as to amounts, we established no precedent regarding error preservation on the precise question plaintiffs raise. There is however ample precedent on a closely analogous question in the field of

---

8. Defendants assert Riccardi was not entitled to any *pro tanto* credit. As can be seen in the above

analysis, we disagree and have applied a share of the credit to him.

compensatory damages. There we have consistently intermixed the concepts of appropriateness of damages and extent of damages. This has occurred routinely in considering motions for a new trial under Iowa rule of civil procedure 224 on a claim of passion and prejudice. The rule is that a new trial should not be awarded, but rather a remittitur should be ordered for the excess, "even in the absence of passion and prejudice [when] justice may be effectuated by ordering a remittitur...." *Schmitt v. Jenkins Truck Lines, Inc.,* 170 N.W.2d 632, 659 (Iowa 1969). *See also Hurtig v. Bjork,* 258 Iowa 155, 160, 138 N.W.2d 62, 65 (1965); *Larew v. Iowa State Highway Comm'n,* 257 Iowa 64, 68, 130 N.W.2d 688, 690 (1964); *Castner v. Wright,* 256 Iowa 638, 657, 127 N.W.2d 583, 594 (1964) (initial opinion).

We find no merit in plaintiffs' complaint that defendants' challenge to the punitive damage award did not carry with it a challenge to its extent. This court had ample authority to consider the extent, as well as the appropriateness of, that award.

We have considered the parties' other contentions and find them without merit. The opinion did contain one clerical and one substantive error. The substantive error, not challenged in the petitions for further review, related to the reduction of punitive damage awards which were in the nature of a remittitur. We omitted according the option of electing a new trial to these plaintiffs. *See Hester v. Meewes,* 256 Iowa 633, 636–37, 126 N.W.2d 308, 310 (1964) (court without power to order reduction of jury award; plaintiff must be accorded option of new trial).

Pursuant to Iowa Supreme Court rule 8.1 our opinion, filed September 21, 1994, is amended as follows:

[Editor's Note: amendments incorporated for purposes of publication.]

All petitions for rehearing are denied and overruled.